(Decided October 20th 1864.)

THE TRUSTEES OF ALLEGANY COUNTY SCHOOL *vs.* SAMUEL S. MAFFIT, COMPTROLLER.

CODE, CONSTRUCTION OF.—THE ACT OF 1860, CH. 335, SEC. 13, incorporated into the Public Local Laws of Allegany County, in ART. 1, SEC. 155 OF THE CODE, does not expressly or by necessary implication, repeal the Acts of 1798, ch. 58, and 1824, ch. 4, or Resolutions No. 50, Nov. Session 1811, and No. 34, Dec. Session 1831, whereby certain 'donations of money were made by the State Legislature to the Trustees of Allegany County School, for the purposes of education.

APPEAL from the Circuit Court for Anne Arundel County:

This is an appeal from an order of the Circuit Court for Anne Arundel County, (BREWER, J.,) dismissing a petition for a *Mandamus.* The case is fully stated in the opinion of this Court.

The cause was argued before BOWIE, C. J., and BARTOL, GOLDSBOROUGH, and COCHRAN, J.

*O. Miller* and *Thos. J. McKaig,* for the appellants.

All the facts alleged in the petition as to the organization of the corporation, created by the Act of 1798, and its continued existence by regular succession and appointment down to the present time, are admitted in the

16 v. 22.

answer, and the sole questions are questions of law arising upon the construction of several Acts of Assembly. The position taken by the Comptroller in his answer and by his counsel in argument, is simply this, that by the 13th sec. of the Act of 1860, ch. 335; the 8th sec. of the Act of 1798, and the resolutions of 1811 and 1831, are repealed, and that all money appropriated for the purpose of education in Allegany County must be paid by him to the treasurer of the Board of School Commissioners created by said Act of 1860. Waiving the question for the present, of the power of the Legislature thus to repeal the Act of 1798 and the resolutions of 1811 and 1831, let us consider whether it was the intention of the Legislature by the passage of the Act of 1860 so to do?

It will be observed that the Act of 1860 does not in terms profess to repeal the Act of 1798, or the resolutions. It only repeals, in terms, certain sections of the Code of Public Local Laws, and enacts others in their stead. Now, independent of the provisions of the Constitution as to repealing Acts of Assembly, how does the case stand upon the construction of this Act of 1860? We invoke a few familiar canons of construction on this subject.

1st. Statutes in *pari materia* are to be construed together.

2nd. In construing statutes, the real intent, when ascertained, will always prevail over the literal sense of the terms, (*State vs. Milburn,* 9 *Gill,* 105,) and if the words do not exclude doubt, the intention is to be collected from the occasion and necessity of the law.

3rd. Every part of a statute should be taken into consideration in order to arrive at the intention of the Legislature. *Mayor, &c. vs. Moore et al.,* 6 *H. & J.,* 382.

4th. Repeals of statutes by implication are things disfavored in law and never allowed of, but where the inconsistency and repugnancy are plain and unavoidable. (See the strong language of Ch. J. BUCHANAN on this question

The Trustees of Allegany Co. School *vs.* Maffit.

in *Canal Co. vs. R. R. Co.*, 4 *G. & J.*, 152, &c., and also the case of *Dugan vs. Gittings*, 3 *Gill*, 138, where it is held that a later statute on a given subject, not repealing an earlier one in terms, is not to be taken as a repeal by implication, unless it is plainly repugnant to the former.)

With these canons in mind what does the Act of 1860 mean? and 1st. What do we gather to be its intent from other statutes in *pari materia?* It is undoubtedly true that up to the passage of the Act of 1860, the Act of 1798, and the resolutions of 1811 and 1831, were in force, unrepealed. Now the general appropriation bill of that year for the year ending January 1st 1862, (ch. 363,) appropriates "to donations to colleges, academies and schools, $21,400," and also, "to the payment of the several sums of money to be distributed among the counties according to law, for the use of free schools, including bonus from bank, dividends from bank stock standing to the credit of the free school fund, and so much of tax on passengers on the Washington branch of the Baltimore and Ohio Rail Road as has been substituted for the surplus revenue $13,568.01." In the previous appropriation bill for the previous year (Act of 1860, ch. 341,) the same sums had been appropriated in the same language for these two purposes. In the subsequent appropriation bills, Acts of 1861, 1862, chs. 185 and 270, the same appropriation is continued for donations to academies, colleges and schools, the sum being increased to $23,000, and the same appropriations to the free school fund to be distributed among the counties. The sum being increased to $63,600. From this it is clear that the 8th sec. of the Act of 1798, and the resolutions of 1811 and 1831, were not supposed by the Legislature to be repealed so far as the sum or donation thereby made is concerned. The inference is also almost irresistible that the Legislature supposed that these donations to colleges, academies and schools, were to be paid to the same parties who had received them

under previous and then existing laws; that is to the visitors and governors of the colleges, and the trustees of the academies and schools, and in reference to the particular corporation here petitioning, in the language of the Act of 1798, ch. 55, sec. 8, "to the aforesaid trustees or their order." If the donation had been considered as repealed or withdrawn, then it is clear the sum appropriated for. the aggregate of these donations would have been decreased in the appropriation bills by $800. If the donation still continues, and the Legislature had designed that any other party than these trustees should receive it from the treasury, then some plain provision must be found in the law, taking from the trustees the power of receiving and applying it "at their discretion" as specified in the section of the Act before referred to.

The Comptroller and his counsel say the Treasurer of the Board of School Commissioners is entitled to receive it, under the 13th sec. of the Act of 1860, ch. 335. Now if the donation is still made and appropriated, (as I think I have shown it is,) then it is clear that this Treasurer, if the law designed he should be the party to receive it from the treasury of the State, can only be a mere agent to pay it over to these trustees. In this view he must receive this donation or appropriation of $800, and pay it over undiminished to the trustees, to be applied at their discretion. No good reason can be assigned for thus interposing a third party between the State and the ultimate recipients of the bounty, when such recipients are capable themselves to take, and are vested with the discretion to apply.

But by looking to the provisions of the Act of 1860, it will be found, (sec. 5,) that this Treasurer is required "to pay over and apply all moneys that shall come into his hands, as Treasurer aforesaid, to such person or persons, and in such manner as the Board of School Commissioners shall direct." This Board by the same law

is empowered to divide the county into School Districts, build school houses, employ teachers, fix their salaries, purchase school sites, &c., provide stationery and books, &c., for the school.

There is no power given them to apply this $800 to this particular corporation, nor are they required to pay or direct its payment over to them; the Treasurer must obey their direction as to all moneys which come into his hands, and they are not required to pay this sum, as the Act of 1798, and the resolutions of 1811 and 1831, direct it to be paid. It is submitted, therefore, that the argument on the other side must go to the extent (if the law of 1860 affects this donation at all) of saying that the donation is entirely repealed and withdrawn, and diverted or allowed to be diverted to other purposes than the charter of this school directs; in other words that the 8th sec. of the Act of 1798 is totally repealed. Such a construction of this law of 1860, is constrained, operating a repeal of a charter by implication, and cannot, it is submitted, be given to it.

Looking to the whole provision, object and scope of this Act of 1860, to the sections of the Code which it expressly and in terms repeals, and for which it is merely a substitute, it will be seen that its whole object was to change, in some measure the management of the Public Schools in Allegany County, and of the Free School Fund by law applicable to such Public Schools. The title of the Act is "An Act to establish a uniform system of Public Schools in Allegany County, and to repeal certain specific sections of the Code of Public Local Laws relating to the county." The Board thereby created is called "The Board of Commissioners of Public Schools in Allegany County." All their duties are in reference to such schools and their management.

If the Legislature had intended to repeal this donation, or to withdraw it from this Academy and divert it to the

Public School Fund, they would have done so in plain language, and in express terms. They would not have left, as they have done, the annual appropriation bills, to contain the usual and customary appropriation for "donations to colleges, academies and schools," but would have diminished these donations, and increased the appropriations to the free schools.

The instances cited by the appellee's counsel in his argument before the Court below, of the diversion of academy fund to the school fund, still further strengthen the argument on our side, that when the Legislature meant to accomplish such an object, they employed plain, explicit and direct language for the purpose. We have examined the charters of most of the academies thus referred to, and in none of them will be found any donation direct from the treasury on the part of the State.

*James Revell,* for the appellee.

The appellants claim said sum of eight hundred dollars under said Act of Assembly and Resolutions above quoted. It is submitted that said sum of money was not due from the Comptroller of the State to said trustees as claimed in their petition for a *mandamus,* because the Act of 1860, ch. 335, sec. 13, declared, that "the present School fund of Allegany County, and all other funds which may be by any law of this State applicable to purposes of education in said county, shall be paid directly to the Treasurer of the Board of Commissioners of Public Schools of Allegany County," &c. This Act of 1860, was incorporated into the Maryland Code of Public Local Laws, Vol. 2nd, Art. 1, from secs. 142 to 157 inclusive, the 155th sec. of said Art. corresponding with the 13th sec. of 1860. The 17th sec. of Art. 3rd of the present Constitution, made it the duty of the Legislature to appoint Commissioners to revise and codify the laws of this State, and in accordance therewith, the Code was reported and adopted, and the Act of

1860, ch. 1, sec. 1, declared the two volumes of said Code to be "in lieu of, and as a substitue for all the Public General Laws, and the Public Local Laws heretofore passed by the Legislature." In the Code thus adopted, not a word is said about the "Allegany County School," but under the head of "Schools." In the 2nd vol. of the Code, Art. 1, secs. 147 to 170, (original Code,) there is a law providing for the regulation of Schools in Allegany County. The Legislature, in the exercise of its judgment, repealed said secs., and enacted therefor the Act of 1860, ch. 335, thus making it a part of the Code and law of the land. See 2 *Code, Art.* 1, *p.* 37, *&c.*

But it may be said in the language of the 1st sec., Art. 1, "Rules of Interpretation of Code," that "the adoption of the Code, shall not affect or impair any right vested or acquired and existing at the time of its adoption," &c. True, but it is denied that this was a vested right as contemplated in said rules of interpretation. The appropriations in the Act of 1798 and Resolutions of 1811 and 1831, cannot be regarded by any fair interpretation as a perpetual annuity, for the Legislature by the 7th sec. of 1798, ch. 58, reserved in express terms a supervisory control over the ordinances of said schools, which would warrant the inference that this donation of $200 was only during the pleasure of the Legislature. The mere act of incorporating an institution and donating a sum of money "annually" to it, without other words to show that it was designed to be perpetual, cannot be any more regarded as a perpetuity or as a contract, than the creating of an office and provision for the payment of the officer an annual salary, which would be repealable at pleasure, either by direct terms or by implication, as will be hereafter shown. But again, there was no appropriation for the Allegany County School after the adoption of the Act of 1860, ch. 335. I admit that there was a general appropriation by the Legislature of donations to colleges, &c.,

but the Comptroller could only pay as the law directed. This sum of eight hundred dollars claimed by the appellants, was certainly for educational purposes in Allegany County, and as the Legislature positively required, by said Act of 1860, all funds which by any law of the State might be applicable to the purposes of education in Allegany County, should be "paid directly to the treasurer of the Board of Commissioners of Public Schools," &c. There was a failure to appropriate any sum to the said school. If this view be not correct, what would prevent the visitors and governors of St. John's College coming in for their annual donation of £1,750 made by the 19th sec. of 1784, ch. 37, out of this general appropriation of the State for colleges, &c. See case of *St. John's College vs. State*, 15 *Md. Rep.*, 330.

The Legislature of Maryland can control its revenue and appropriate its money as to it seems best. The question whether it acted in good faith to this Allegany County School was not for the Comptroller to decide or this Court to inquire into. The case of *St. John's College*, 15 *Md. Rep.*, 330, is not a case in point.

*Thos. S. Alexander*, on the same side:

The counsel for the appellants have properly limited the discussion to the question of construction, and the question of right.

1. As to construction. The school fund is treated on the books of the treasury as a specific fund, distinct from the other funds belonging to the State. It originated with the tax on bank charters, and from time to time has been increased by revenues derived from other sources, and it forms the subject of an appropriation, which is entirely distinct from the appropriation for colleges, academies and schools.

This distinction is kept up by the Act of 1860, ch. 335, sec. 13, which makes payable to the treasurer the present

school fund of Allegany County, which would carry the share of the county in the funds set apart for the support of schools in the county, and next, "all other funds which may be by any law of this State, applicable to purposes of education in said county." This last refers to some fund distinct and different from the fund already designated by the Act as "the School Fund," and therefore looking to the existing state of the law, must embrace the donations made to academies for the purposes of education.

On the other side it is suggested, that at the time the Act of 1860 was passed, some other bill was depending, which proposed to increase the school fund of the county, and the expressions to which I have last referred were designed to operate upon this increase, in the event that the grant should be made. This argument is open to various objections. This Court cannot ascertain judicially the truth of the fact alleged, to wit, of the pendency of the bill proposing to make the additional appropriation at the moment of passing the Act of 1860, ch. 335. The argument assumes that the two bills were pending at one time, and concedes that the order in which they were acted upon might have been reversed. In this event—that is to say—if the bill printed as chapter 389 had been passed before the bill printed as chapter 335 was passed, it is admitted that the construction of the chapter 389 would be the reverse of that which is now contended for. It becomes material then to settle, by an appeal to the record, the order in which the two bills were passed.

I am not content to rely on the marginal note in the volume of printed laws, as conclusive on that or any other question. If it should be found that the Act ch. 335, was enacted before the Act ch. 389, grave authority may be referred to in support of the proposition, that for the purposes of construction and operation it speaks as if enacted

17     v. 22.

on the first day of May 1860, on which day, by force of its second section, it was to go into effect.

The "present School Fund" would therefore include the accumulation made by an Act passed on the 10th March, and going into operation on that day.

Passing over the improbability that the Legislature would prepare two bills, the letter of which should intend one thing, on the possible contingency of the bills passing into laws, in one order of succession, and should intend a different thing in the contingency equally possible, of the bills being enacted in another order; the fallacy of the argument will be found to consist in the theory assumed, that "may" must import a possibility of future action. It is used just as frequently to import a probability of present existence. When we affirm that the planets "may" be peopled by human beings of a higher order than ourselves, we do not intend that Providence, by a future exercise of its creative power may bring into existence beings who, at the present time, have no existence, and endow them with natures or qualities which are at present unknown. We affirm simply the probability of the existence, at this moment, of beings endowed with the characteristics which we impute to them. "May," as the sign of the present potential, denotes, in itself, an existing capacity, and it is only by reason of its accidental association with other words, that it can be made to relate to future being or action. But the only word in the sentence associated with "may," is "applicable," which, like "may," denotes a present quality, or existing capacity, and, like "may," is capable, by association, of a relation to the future. Thus, "applicable,"—"is applicable,"—"may be applicable,"—all denote a present quality, whilst "may be made applicable," clearly refers to the future. The conclusions therefore are, that the expression, "that all other funds which may be, by any law of this State, applicable to the purposes of education in said county," em-

braces all other sums which are, by force of the then existing laws of the State, made applicable to the purposes of education.

2. That it embraces all other funds exclusive of the present school fund.

3. That as there are no other funds, saving the donation to the academy, it embraces, of necessity, this donation.

It will be impossible on any other hypothesis to account for the diversity in the expressions used in reference to the different funds which are spoken of. The Legislature must have known that, upon settled rules of construction, any increment to the school fund of Allegany County, created by any future law, will become payable to the treasurer, unless a different destination is given to it by the law making the appropriation.

[NOTE.—This Court in its decision, not having considered the question of the power of the Legislature to repeal the Acts of Assembly and resolutions granting the donations in question, the elaborate arguments on this point are omitted.]

BOWIE, C. J., delivered the opinion of this Court.

The relators were incorporated by the Act of 1798, ch. 58, by the name of the Visitors of Allegany County School. Their corporate name was changed by an Act of December session 1824, ch. 4, to the Trustees of Allegany County School. The sum for which they pray a *mandamus*, commanding the appellee, to issue his warrant to the Treasurer, is claimed under three distinct Acts of Assembly. Two hundred dollars, part thereof, is alleged to have been granted by the 8th sec. of their Act of Incorporation, which enacts, that—"the Treasurer of the Western Shore shall pay to the aforesaid trustees, or their order, annually, as a *public donation*, the sum of two hundred dollars

for the purposes of education, the first payment whereof shall be made on the first day of October next, for the use and encouragement of the school aforesaid.'' Three hundred dollars are claimed under Resolution No. 50, November session 1811, whereby it was ordered, that ''the Treasurer of the Western Shore be authorized, and directed to pay to the Trustees of Allegany County School the sum of three hundred dollars on the first Monday of October, annually, in addition to the present donation.'' The residue of three hundred dollars is claimed under Resolution No. 24, December session 1831 which ordered—''The Treasurer of the Western Shore to equalize the donations granted to academies and schools in the several counties of this State, so as to give eight hundred dollars to each county, to be paid by him to said academies and schools rateably for each of those counties which do not now receive that sum.''

The petitioners charge: that ''the old academy building'' was found too small to accommodate the pupils, and in 1849 they applied to the county commissioners, who appropriated to their use, a lot of ground in perpetuity, of the public ground of the city, for the purpose of erecting a large and commodious academy; ''that having no funds belonging to the institution wherewith to erect said building, by holding out to the citizens of the county, the rights, powers, and privileges granted them by the State, and the annual donations to the petitioners in their corporate character, the citizens of the county were induced to subscribe large sums, by which the petitioners were enabled to build, and did build a large and spacious academy on said lot, at a cost of nearly $5,000,'' etc.; and that the Comptroller has refused his warrant for the donations, and prays a *mandamus.*

The answer admits most of the matters of fact charged in the petition, but denies the right of the petitioners to the *mandamus,* for the reasons assigned,—among others,

that there was no appropriation of the said sum of $800 for the benefit of the trustees to be paid to them by the Comptroller after the 1st of October 1862; that the Comptroller had no right or authority, and was under no obligation to issue his warrant for said sum of money; that the Act of 1860, ch. 335, sec. 13, makes a different disposition of all funds of the State appropriated for educational purposes in Allegany County.

The traverse to the answer presents several issues which may be reduced to two questions. 1st. Was there any sum of money due from the State to the petitioners? 2nd. If any was due, was there any appropriation to pay the amount? It is admitted that Resolution No. 50, 1811, and Resolution No. 34, 1831, were passed, but it is contended, that the latter made no specific appropriation for the use of the relators, and that sec. 8th of the Act of 1798, ch. 58, as well as the Resolutions aforesaid, were temporary and revocable, and were repealed by the Act of 1860, ch. 335, sec. 13.

The Act of 1860, ch. 335, sec. 13, incorporated into the Public Local Laws of Allegany County in Art. 1, sec. 155 of the Code, does not expressly, or by necessary implication, repeal the Act and Resolutions before cited. The language of that section, as far as necessary to be quoted, is: "The present school fund of Allegany County, and all other funds which may be applied to the purposes of education in said county, shall be paid directly to the Treasurer of the Board of Commissioners of Public Schools of Allegany County." The word "fund" is used figuratively. The cause is put for the effect. The meaning is, the dividends, or interest accruing from the funds or capital invested for the use of Allegany County, and the dividends or interest upon all other funds which may be thereafter applied to the purposes of education, should be paid directly to the Treasurer of the Board of Commissioners of Public Schools of Allegany County.

The "Free School Fund," was the only fund then applied for the purposes of education in said county. The origin and character of this fund, is well known, and constitutes a distinct source of revenue, applied to the purposes of education in certain ratios among all the counties in the State. Donations to academies are. a distinct and separate class of appropriations, to be paid out of any unexpended money in the treasury. The charter and resolutions making these donations, being, in our judgment, unrepealed, and not affected by the Act of 1860, ch. 335, sec. 13, it is unnecessary to enter into the consideration of the question so elaborately argued by the counsel, whether such donations are revocable or not. The appropriations for the benefit of academies, appear to be as large, if not larger, since the passage of the Act of 1860 as before. There can be no doubt therefore of the right, power and duty of the Comptroller to issue his warrant as prayed. There is no discretion vested in the Comptroller in this case, as there was in that of *Green vs. Purnell,* 12 *Md. Rep.,* 333. In that case this Court held there was no appropriation for the benefit of the relators, but for a specific purpose, involving the exercise of the judgment of the Comptroller in adjusting and settling an account, in which case no *mandamus* would lie.

The defendant in this case, having died and ceased to be in office, a question arises which has not been argued, viz: whether the *mandamus* should go against his successor. The Court will forbear to pass a final order, that counsel may be heard on this point, if they desire it.

(Decided October 20th 1864.)