# THE HORACE MANN LEAGUE OF THE UNITED STATES OF AMERICA, INC. ET AL. v. BOARD OF PUBLIC WORKS OF MARYLAND ET AL.

[No. 356, September Term, 1965.]

646

*Decided June 2, 1966.*

*Motions for rehearing filed June 22, 1966, denied June 28, 1966; motion for rehearing filed July 5, 1966, denied July 25, 1966.*

650

The cause was argued before PRESCOTT, C. J., and HAM-
MOND, HORNEY, MARBURY and OPPENHEIMER, JJ., and KEAT-
ING, J., Associate Judge of the Second Judicial Circuit, and
POWERS, J., Associate Judge of the Seventh Judicial Circuit,
both specially assigned.

*Leo Pfeffer* and *Melvin J. Sykes,* with whom was *Walter R. Tabler* on the brief, for the appellants.

*Thomas B. Finan, Attorney General,* with whom were *Robert C. Murphy, Deputy Attorney General,* and *Edward L. Blanton, Assistant Attorney General,* on the brief, for the Board of Public Works of Maryland, one of the appellees.

*William L. Marbury,* with whom was *Lewis A. Noonberg* on the brief, for St. Joseph College, Notre Dame College and Hood College, part of the appellees.

*Ridgely P. Melvin, Jr.,* for Western Maryland College, the other appellee.

*Francis X. Gallagher, George T. Tyler* and *J. Nicholas Shriver, Jr.,* on the brief for St. Joseph College, an appellee.

*Alfred L. Scanlan* and *George W. Constable* on the brief for Notre Dame College, an appellee.

*Parsons Newman* on the brief for Hood College, an appellee.

*Arthur E. Sutherland* of counsel on the brief for the appellees generally.

Brief of *amicus curiae* filed by *Franklin C. Salisbury* for the Protestants and Other Americans United for Separation of Church and State.

PRESCOTT, C. J., delivered the majority opinion of the Court. HAMMOND, HORNEY and MARBURY, JJ., dissent in part. Dissenting opinion by HAMMOND, J., at page 691, *infra*.

After dismissal of their bill of complaint, which challenged the validity, as violating the Federal and Maryland Constitutions, of four separate statutes, providing outright, matching grants, totaling $2,500,000, for the construction of buildings, to four private colleges, the plaintiffs appealed. The four colleges and appropriate public officials were named as defendants; injunctive relief and a declaration to the effect that the grants were unlawful were prayed.

The questions involved have been briefed and argued with signal care, skill, and ability by counsel for the respective parties.

The appellees contend that appellants lack standing to invoke the jurisdiction of the courts. The principal issue, of course, is whether any one (or more) of the statutes violates the First and Fourteenth Amendments to the Federal Constitution, or Articles XV, XXIII, or XXXVI of our Declaration of Rights. Appellants concede that some degree of relationship to church or religion may exist in an educational institution without rendering it "sectarian"; they contend, however, that when such a relationship is "substantial," it renders the institution sectarian and grants of public funds may not constitutionally be made to it. Four of the appellees state that the colleges involved "are admittedly related in varying degrees to particular religious denominations," but urge that there is no constitutional proscription against a state granting "public funds to a sectarian college, nor is there anything in either constitution which forbids grants for educational purposes to colleges

which bear a substantial relation to a church." We think the orderly and efficacious sequence in which to consider these issues is first to determine the question of standing, for if the appellees prevail thereon, it will control the entire appeal; next to decide the test to be applied to the statutes in determining whether they are constitutionally permissible or impermissible under the First Amendment; then to apply that test to the facts in the record pertaining to the individual colleges; and finally to consider whether the grants violate the named sections of the Maryland Constitution.

## THE STANDING OF THE PARTIES PLAINTIFF.

The Chancellor held that the Horace Mann League of the United States of America, Inc., lacked standing. We agree. It is a non-profit educational and charitable Maryland corporation organized, as claimed by it, for the purpose of fostering and strengthening the American public school system.

It argues that the Chancellor "took an unduly restrictive view of the status in modern jurisprudence of organizations formed to protect the public interest * * *," asks us to compare several Federal cases in which the N.A.A.C.P. participated as a party, and to consider several law-review articles relative thereto. We have considered the same, but find nothing therein which would warrant our departing from the former rulings of this Court. The Chancellor was correct in his ruling. *Citizens Committee v. County Commissioners*, 233 Md. 398; *Bar Association v. District Title Co.*, 224 Md. 474.

The appellees challenge the standing of the individual appellants on two grounds: (a) "the miniscule dimensions of the plaintiffs' financial stake in the challenged programs * * *"; and (b) that if Maryland were required to educate the Maryland students who now attend the appellee colleges, the cost would be much greater to the State than the grants under consideration.

### (a)

Most of the appellees, rightly we think, concede that the recently decided case of *Murray, Etc., v. Comptroller*, 241 Md. 383, fatally undermines their argument here. Having so recently considered and enunciated our conclusions on the question, it

would be a useless gesture to elaborate further thereon. We hold that *Murray* is controlling on this point, and the individual appellants do not lack standing for the reasons there assigned.

### (b)

There are a number of answers to this contention. We shall name but two. All of the parties agree that the issues here presented are of great public interest and concern. When this is the case, the necessary interest or injury to sustain standing to institute a taxpayer's suit is "broadly comprehensive" and may be "slight." In *Baltimore Retail Liquor Stores Ass'n v. Board of License Comm'rs*, 171 Md. 426, this Court stated its opinion on the merits, even though the plaintiffs lacked technical standing. For other cases wherein there were similar holdings or the principle recognized see *Citizens Committee v. County Comm'rs, etc., supra; Hammond. v. Lancaster*, 194 Md. 462; *Dutton v. Tawes*, 225 Md. 484. We agree with the parties that the issues are of general and urgent public interest, and they are of sufficient importance and magnitude to invoke the above principle, if the factual situation rendered it necessary to do so.

However, we do not find it necessary to base our conclusion that the individual appellants have standing on the above theory, alone. In *Berghorn v. Reorganized School District No. 8*, 260 S. W. 2d 573 (Mo.), taxpayers' standing to sue to prevent expenditures of state funds for religious schools was attacked on the ground that the challenged expenditure would cost plaintiffs less than the taxes they would be required to pay if the students at such religious schools were educated in the public schools. In sustaining plaintiffs' standing and granting relief, the court stated:

> "In determining a taxpayer's pecuniary injury resulting from the unlawful expenditure of public funds, we may not weigh lawful expenditures against unlawful expenditures, because no legal injury results from the lawful expenditures of public funds."

We agree with the Missouri Court. Also compare this Court's holding in *McKeldin v. Steedman*, 203 Md. 89, wherein the same principle was applied, although no religious issue was

654

there involved, and *Abington School Dist. v. Schempp,* 374 U. S. 203, n. 9.

Further on the question of standing, appellees argue that if the suit had been instituted in a Federal court, appellants would have lacked standing to attack the grants as being impermissible under the United States Constitution; hence the Maryland courts should not permit them to challenge state statutes as being violative of the Federal Constitution in the state courts. Again, the *Murray* case, *supra,* supplies the quick answer, wherein Judge Oppenheimer, for the Court, said:

> "When the validity of a state statute is attacked in a state court, it is the duty of that court to determine all the constitutional issues involved, federal as well as state. If the statute is held valid under the state law, but invalid under the federal Constitution, the state court must give the complainants the relief they pray. * * *. If they have standing under the law of Maryland to bring the suit, it is irrelevant that the result might have been different had the action been instituted in a federal court." 241 Md. p. 392.

We hold that the Chancellor was correct in ruling that the individual appellants had standing.

### THE TEST TO BE APPLIED.

It should be noted at the outset that nothing in this opinion is intended as a criticism of, or a boost to, any religion, sect, or schism, or lack of religion. Our task is to decide a constitutional issue. We proceed to do just that, and that alone.

For our present purposes, it will be unnecessary to include an extended historical background of the First Amendment [1] (which, of course, is likewise pertinent, in large measure, to

---

1. Those interested in pursuing this aspect of the case further will find interesting, instructive, and rather comprehensive treatments of the subject in Justice Black's opinion in Everson v. Board of Education, 330 U. S. 1, in Justice Frankfurter's opinion in McCollum v. Board of Education, 333 U. S. 203, in Justice Clark's opinion in Abington School Dist. v. Schempp, supra, Justice Rutledge's dissent in Everson, supra, and in 2 Cooley's Constitutional Limitations, pp. 960-985.

Article XXXVI of our Declaration of Rights). However, it seems appropriate to set forth a sketchy outline of some of the facts which the Framers of our Federal Constitution and the First Amendment thereto had in mind when the Amendment was added. In about 112 A.D., Pliny wrote to the Roman Emperor Trajan to inquire whether he was dealing out exact justice to Christians who had done nothing in violation of the law. He stated that he asked thrice if the person charged (man, woman, or child) were a Christian. If the person answered in the affirmative 3 times, he or she was executed. Trajan answered, "My Pliny—you have taken the method which you ought * * *." [2] The persecution of the Christians by the heathens continued (by throwing them to the lions, etc., as every school child is taught) until about A.D. 313, when Emperor Constantine embraced their belief; and later in the 4th century Christianity became the official religion of Rome.

After Christianity became the established Church of Rome and the Church gradually increased in wealth and power, there constantly developed disputes in the various provinces between the Roman bishops and the civil authorities as to their respective authority. In time, the Church became so rich and influential that certain of the Popes felt free to assert their authority as being superior to that of the reigning Sovereigns. This, naturally, developed angry and deep-rooted conflicts and controversies between the Papacy and some of the nations, and also between nations, themselves, depending upon whether or not they agreed with the Papacy.

The religious Crusades (about 1096 to 1270) are also subjects which are still taught to nearly every school child. They engaged, off and on for some 200 years, practically all of the continental European nations and England in costly and cruel warfare in attempts to capture and to hold the Holy Land. In these conflicts, not only reigning monarchs and nobility participated in actual combat but also Church bishops and clerics. A fact concerning the Crusades, not so generally known as the above, is that two of them were armies of about 30,000 and

---

2. The Genuine Works of Flavius Josephus (dissertation), pp. 63-65.

20,000, respectively, composed of small boys and girls, many of whom, quite naturally, died.[3]

We pass over a short period of time, in which the unbridled fervor and fanaticism of the Church grew and expanded, to the origin of the Spanish Modern Inquisition (about 1481). Frequently this fervor vied with secular authority and caused most important incidents such as the murder of Saint Thomas à Becket, the Roman Catholic Archbishop of Canterbury, while at vespers, in 1170 A.D.[4] Because of his opposition to royal authority, Henry II is reputed to have said in the presence of his knights: "Have I not about me one man of enough spirit to rid me of a single insolent prelate?" Four knights immediately accepted the "commission," and carried out the king's expressed desire. Another important event occurred shortly thereafter (about 1208). Pope Innocent III commanded a delegation of the monks at Canterbury to select Stephen Langdon archbishop in place of a person whom King John had compelled them to elect. The King refused to permit Langdon to land in England. After trying other measures, the Pope "deposed" John and ordered King Philip of France to seize the English Crown. In the end John was forced to accept Langdon, and in addition to promise to pay a tax of some $64,000 (in current money) a year for permission to keep his crown.

We need not dwell long on the horrors and perfidies of the Inquisition, but to understand the intensity of feelings motivating the persecutions of this era, it is necessary to know the teachings of the Church at that time and what the law of the civil authorities authorized. We quote a few excerpts from authorities relative thereto:

> "Acts of intolerance are to be discerned from the earliest period in which Christianity became the established religion of the Roman Empire. But they do not seem to have flowed from any systematized plan

---

**3.** 3 World Book Ency., p. 928.

**4.** 3 The World Book Ency. p. 150. A pilgrimage from London to Canterbury, where the Saint was buried, is, of course, the theme of Chaucer's famous "Canterbury Tales."

of persecution, until the papal authority had swollen to a considerable height."

\* \* \*

"In the present liberal state of knowledge [about 1837], we look with disgust at the pretensions of any human being, however exalted, to invade the sacred rights of conscience, inalienably possessed by every man." [5]

"But, to judge the action fairly, we must transport ourselves to the age when it happened. The difficulty that meets us in the outset is, to find a justification of the right of conquest, at all. But it should be remembered, that religious infidelity, at this period, and till a much later, was regarded—no matter whether founded on ignorance or education, whether hereditary or acquired, heretical or Pagan—as a sin to be punished with fire and faggot in this world, and eternal suffering in the next. This doctrine, monstrous as it is, was the creed of the Romish, in other words, of the Christian Church,—the basis of the Inquisition, and of those other species of religious persecutions, which have stained the annals, at some time or other, of nearly every nation in Christendom. Under this code, the territory of the heathen, wherever found, was regarded as a sort of religious waif, which, in default of a legal proprietor, was claimed and taken possession of by the Holy See, and as such was freely given away by the head of the Church, to any temporal potentate whom he pleased, that would assume the burden of conquest. Thus, Alexander the Sixth generously granted a large portion of the Western hemisphere to the Spaniards, and of the Eastern to the Portuguese. These lofty pretentions of the successors of the humble fisherman of Galilee, far from being nominal, were acknowledged and appealed to as conclusive in controversies between nations." [6]

---

5. I Prescott's Ferdinand and Isabella, pp. 230, 231.

6. II Prescott's Conquest of Mexico, pp. 30, 31. Lea, A History of the Inquisition in the Middle Ages.

We move on to a later date (around 1500) and see the conflicts and controversies between Church and State continuing.

"We shall conclude this Chapter by a melancholy truth which obtrudes itself on the reluctant mind; that even admitting * * * all that history has recorded * * * on the subject of martyrdoms, it must still be acknowledged that the Christians in the course of their intestine dissentions, have inflicted far greater severities on each other than they had experienced from the zeal of the infidels. * * *. In the Netherlands alone more than 100,000 of the subjects of Charles V are said to have suffered by the hand of the executioner." [7]

The protracted controversies between Henry VIII and the Papacy, with attendant executions, were, and are, well known. They resulted in a series of enactments of Parliament which severed the great financial, legal, and administrative ties which had joined the English state with Western Christendom, and the English Church with the Holy See. The Act of Supremacy declared Henry the head of the Church of England and the inheritor of the jurisdiction of the Bishop of Rome. After the knowledge of several "judicial murders" in England reached Rome, the Pope issued a bull which excommunicated Henry, delivered his soul to Satan, and his kingdom to the first invader. The King replied by sequestering and, after pillaging, destroying a large number of religious houses [8] (reputed as 645 monasteries, 2374 chapels, 90 collegiate churches and 110 charitable institutions).

Six years after the death of Henry, his daughter Mary ascended the throne. She was a devout Roman Catholic, and did everything she could to re-establish that Church in England. She resumed old relations with the Pope, and to accomplish her objectives in supporting her religion, she resorted to the

7. II Gibbon, The Decline and Fall of the Roman Empire, (Smeaton ed.) pp. 197, 198.

8. Montgomery, The Leading Facts of English History, pp. 197, 198.

arguments of the dungeon, the rack and the fagot, and, when her bishops slackened their work of persecution and execution, she urged them not to stay their hands.[9] The penalty for reading the English Scriptures or offering Protestant prayers was death.[10] Montgomery, *op. cit.* in footnote 8, at p. 209, says that Mary's state of mind was the same as all who then held strong convictions, and "each party believed it a duty to convert or exterminate the other, and the alternative offered to the heretic was to 'turn or burn.' "

Elizabeth I (1558-1603) succeeded her sister Mary on the throne, and we are now approaching the period when the first permanent English colonies were to be established on this continent. Her ascension was followed by the repeal of many of the religious laws enacted in Mary's reign, the enactment of a new Act of Supremacy, and an adoption of a revised version of the religious beliefs of the English Church, formulated under Edward VI (1547-1553). Commenting on these and other enactments, Montgomery, *op. cit.* at p. 214, states: "The reason for these stringent measures was in that age Church and State were everywhere considered to be inseparable. No country in Europe —not even in Protestant Germany—could then conceive the idea of their existing independently of each other. Whoever refused to support the established form of worship, *whatever that might be,* was looked upon as a 'rebel' against the government." (Emphasis added.)

The number of Puritans, Protestants who did not believe that the tenets of the Established Church of England went far enough in "purifying" that Church from Roman influences, grew by leaps and bounds in the last half of Elizabeth's reign. Before James I was crowned (1603), they presented a great Petition to him requesting certain rights and privileges. The requests were denied and James avowed he would make all conform to the Established Church or leave the country. In despair but with firm determination, a band of these Puritans, not being able to obtain a royal license to go to America, emi-

9. Montgomery, op. cit., p. 209.

10. Benjamin Franklin, one of the Framers, gives an interesting account in his autobiography of how one of his ancestors circumvented this proscription.

grated (about 1608) to Holland where they remained for 12 years. Finally James granted them permission to go to America, so in 1620 (just 2 years after the beginning of the devastating religious war in Europe called the Thirty Years' War, and 29 years before the Puritans beheaded King Charles I) our Pilgrim Fathers set sail for this country, being the first Englishmen to flee from religious persecution, seeking an asylum in this country where they could worship according to the dictates of their consciences.

We shall narrate, briefly, two other events that occurred in Europe, and do so because of their importance to, and influence over, the colonies of this country as they developed. We mentioned above the Thirty Years' War (1618-1648) ; it began as a civil war between the Protestants and the Roman Catholics in the German States, but before it was over nearly all of the nations of Europe became involved. One authority gives the following account of the results thereof :

> "Germany was in a pitiable condition by the time the war finally ended. *More than half the people had been killed.* Those who survived saw nothing but ruin wherever they looked. Whole cities, villages, and farms had disappeared, *and two thirds of all the property had been destroyed.* Art, science, trade, and industry languished. It took about two hundred years for Germany to recover from the effects of [this war]. *Thousands of persons left Europe, especially Germany, and went to America to build a new life."* [11] (Emphasis added.)

Finally, we mention the fate of the Huguenots in France. They were French Protestants, who grew into sizable proportions in the 1500's and 1600's. A civil war broke out between them and the Roman Catholics. Without going into the sad details of that unfortunate conflict, the Huguenots, after much bloodshed and many deaths, were given freedom of worship in about 75 towns and cities by the Edict of Nantes (1598), but

---

11. 17 The World Book Ency., p. 200; see also 2 World's Best Histories, Germany, Part XVIII; 22 Encyclopedia Brittanica, pp. 136 et seq.

they again lost the same in 1685, when Louis XIV repealed the Edict. Again we find:

> "Thousands of Huguenots fled France to new homes in England, Germany, Holland, and America. *Many settled and prospered in South Carolina, Virginia, Massachusetts, and New York* [emphasis ours]. Among such Huguenots were the Legare, Petigru, Maury, Revere, Jay, and DeLancey families." [12]

We shall not discuss in detail the complexities that arose concerning Church and State in each of the Colonies. It seems obvious that our revered Pilgrim Fathers, who had come here to seek religious freedom, were not in a mood to grant complete religious freedom of thought to all others. We all know of the banishment of Roger Williams. It also is apparent that Maryland's vaunted Toleration Act of 1649 granted religious tolerance only to Christians, and it is entirely possible that it was prompted, at least in part, by expediency. The Puritans had taken over the government in the Mother Country in the early part of that year, and the Lord Proprietor, in order to strengthen his position with the Home Government had issued invitations to settle here to the New England Puritans and those of Virginia, where Governor Berkeley, in spite of the Puritan successes in England, remained a Royalist and an adherent of the Anglican Church. Andrews, *The Founding of Maryland*, Ch. XII. We close our remarks concerning the colonies with the observation that at least 8 of them had Established Churches before the Revolution; and Virginia, after a struggle lasting about 7 years had defeated a Bill which would have permitted taxation to support religions and had enacted Jefferson's Bill for Establishing Religious Freedom, in 1786. (For an instruc-

---

12. 8 World Book Ency., p. 375. For a rather detailed account of the trials and tribulations of the Huguenots, and the extreme provisions of the Resolution revoking the Edict of Nantes—demolition of all chapels, interdiction of any assembly or worship, all ministers to leave the kingdom within 15 days, all schools closed, new-born babies to be baptized by the parish priests, Huguenots forbidden to leave the kingdom on pain of galleys for the men, and confiscation of person and property for the women, etc.—see IV The World's Best Histories, France, Ch. XLVII.

tive and more comprehensive treatment of the situation in the Colonies, see Justice Black's opinion in *Engel v. Vitale*, 370 U. S. 421.)

Thus it is seen that the Framers knew man's difficult-to-suppress (and still unextinct) desire to persuade, and failing in persuasion, to compel others to adopt and believe his religious views, and man's unswerving determination to select the religious views most appealing to him individually and his quest to believe those views and to worship without fear or favor had been potently divisive forces ever since the deeds of mankind had been recorded. So great had been the impact of the latter determinants that neither dungeons, mortally bleak winters in far-distant colonies, plain executions, wholesale burnings at the stake, nor the prolonged and "exquisite" agonies produced by the tortures of machinations developed by the most ingenious minds of the ages (i.e. "persecution in perfection") had dissuaded man in his pursuit of religious freedom and religious equality.

Even though the above is but a sketchy outline of the subject involved (as we stated above), we have set the same forth at some length to demonstrate that the problem to be considered and solved when the First Amendment was proposed was not one of hazy or comparative insignificance, but was one of blunt and stark reality, which had perplexed and plagued the nations of Western Civilization for some 14 centuries, and during that long period, the union of Church and State in the government of man had produced neither peace on earth, nor good will to man.

In an attempt to prevent recurrences of many of the unfortunate evils mentioned above (and those mentioned in the opinions named in footnote 1) our forebears decided it was best for Government, best for Religion and best for mankind that the two be kept separate and apart. In order to effectuate this goal, the First Amendment was adopted which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *." [13] A

---

13. At this late date, it requires no citation of authority to assert that the same proscription applies to the states through the Fourteenth Amendment.

narrow and literal reading of the same might cast some doubt as to whether our present factual situation presents any question relative to an "establishment" of religion, but we shall point out below that the Supreme Court has not construed the Amendment in such a narrow fashion as to exclude the issues here raised from its purview. See, for example, *McCullom v. Board of Education, supra,* 333 U. S. at p. 213.

Before considering the Supreme Court decisions, we shall dispose of two subordinate arguments advanced by the appellees. Under the heading of Legislative Practice, they set forth large and imposing grants made by Congress to various institutions and programs sponsored by governmental agencies and departments. The actions of the Legislative Branch are, of course, entitled to consideration and respect, *Murray, Etc. v. Comptroller, supra,* 241 Md. at p. 400; but they are not controlling in the determination of a direct and specific constitutional attack on an individual statute. *Schempp, McCollum,* and *Engel,* all *supra,* and *Torcaso v. Watkins,* 367 U. S. 488, wherein the Supreme Court uprooted long-standing and established practices sanctioned by legislative and state constitutional provisions.

They also argue that if the grants herein be invalidated, that no state grant to any educational institution could be sustained, unless every vestige of officially sponsored religious observances be entirely divorced from the institution. The appellants label this "appellees all-or-nothing argument." The argument loses sight, we think, of the fact that there is a constitutional difference between a sectarian institution and a secular one, which may officially sponsor one or more religious observances. We shall point out the test to be applied below.

This brings us to a consideration of the Supreme Court decisions bearing on the questions herein involved. The parties on both sides of the controversy have carefully analysed the same in their briefs. Justice Clark did likewise in his opinion in *Schempp, supra,* as to the decisions preceding it. However, we do not deem it necessary or desirable to take up each of these decisions and analyse them in detail, for this Court has very recently stated their rationale in *Murray, Etc., supra* (241 Md. at pp. 398 and 401, involving church exemptions from taxa-

tion), where Judge Oppenheimer, for the Court without dissent, said:

> "In our reading of the opinions, however, we find broad guide lines which form the frame within which the case before us is to be considered. We are a religious people and recognize the effect religious institutions have on human activity. The First Amendment was designed to erect 'a wall of separation between church and State.' Mutual independence, under our Constitution, is deemed best for the State and best for religion. *The State cannot forbid nor can it perform or aid in performing the religious function. Like other broad constitutional concepts, the meaning of 'separation' is to be ascertained in the application of the principle to specific cases.* A state cannot pass a law to aid one religion or all religions, but state action to promote the general welfare of society, apart from any religious consideration, is valid, even though religious interests may be indirectly benefited. If the primary purpose of the state action is to promote religion, that action is in violation of the Amendment, *but if a statute furthers both secular and religious ends, an examination of the means used is necessary to determine whether the state could reasonably have attained the secular end by means which do not further the promotion of religion.*" (Emphasis added.)

* * *

> "As *McGowan* makes clear, even though the exemption had an unmistakably religious origin, if the present purpose and effect of the exemption is primarily secular, *and if those* secular purposes could not reasonably be deemed achievable without an incidental benefit to religious organizations, the 'establishment' clause is not violated." [14]

---

14. The above rationale is supported and emphasized by so many statements in the Supreme Court's decisions that one is at a loss to know where to start and where to end in naming them. We set forth a few. "These words of the First Amendment reflected in the minds of early Americans a vivid mental picture of condi-

There are two celebrated passages in the opinions of the Su-

tions and practices which they fervently wished to stamp out * * *." "These practices [the collection of taxes and tithes to sustain government-sponsored churches] became so commonplace as to shock the freedom-loving colonials into a feeling of abhorrence. * * *. The people there [in Virginia], as elsewhere, reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions * * *." After quoting from the celebrated "Virginia Bill for Religious Liberty," 12 Hening, Statutes of Virginia (1823) 84, originally drafted by Jefferson, stating that "Almighty God hath created the mind free; that all attempts to influence it by temporal * * * burthens * * * tend only to beget habits of hypocrisy and meanness * * *," and "that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical * * *," the Supreme Court "* * * recognized that the provisions of the First Amendment * * * had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute." * * *. "New Jersey cannot consistently with the 'establishment of religion' clause * * * contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church." All from the majority opinion in Everson, supra.

"With Jefferson, Madison believed that to tolerate any fragment of establishment would be by so much to perpetuate restraint upon that freedom [general freedom]. Hence he sought to tear out the institution not partially but root and branch, and to bar its return forever."

"In no phase was he [Madison] more unrelentingly absolute than in opposing state support or aid by taxation. Not even 'three pence' contribution was thus to be exacted from any citizen for such a purpose." Memorial and Remonstrance against Religious Assessment. [The Memorial is set forth in Appendix, 330 U. S. pp. 63 et seq.] * * *. "Their objection was not to small tithes. It was to any tithes whatsoever. * * *. Not the amount but the 'principle of assessment was wrong.'" * * *. "In view of this history no further proof is needed that the Amendment forbids any appropriation, large or small, from public funds to aid or support any and all religious exercises." A few excerpts from Justice Rutledge, with whom Justices Frankfurter, Jackson, and Burton concurred in Everson, supra, dissenting.

In McCollum, supra, interested members of the Jewish, Roman Catholic, and some of the Protestant faiths formed a voluntary association. They obtained permission from a Board of Education to offer classes in religious instruction in the public schools. "The

preme Court relating to the provisions concerning religion in

foregoing facts * * * show the use of tax-supported property for religious instruction * * *. The operation of the State's compulsory education system thus consists and is integrated with the program of religious instruction * * *. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith. And it falls squarely under the ban of the First Amendment * * *." "The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the State's compulsory public school machinery. This is not separation of Church and State." From the Courts opinion in McCollum, supra.

Justice Frankfurter, with whom Justices Jackson, Rutledge and Burton agreed in his concurring opinion in McCollum, supra, said:

"Illinois has here authorized the commingling of sectarian with secular instruction in the public schools. The Constitution of the United States forbids this."

\* \* \*

"Separation means separation, not something less. Jefferson's metaphor in describing the relation between Church and State speaks of a 'wall of separation,' not of a fine line easily overstepped."

In Engel, supra, it was stated:

"They knew the anguish, hardship and bitter strife that could come when zealous religious groups struggled with one another to obtain the Government's stamp of approval from each King, Queen, or Protector that came to temporary power."

"When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain."

Among many other cogent statements in Schempp, we find the following:

"There is no answer to the proposition * * * that the effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayers' expense * * *."

\* \* \*

"It was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion."

\* \* \*

"The wholesome 'neutrality' of which this Court's cases speak

the First Amendment: the first is in *Everson;* the other is in *Schempp.* Justice Black, for the Court, in *Everson,* said:

thus stems from a recognition of the teachings of history that powerful sects or groups might bring about a fusion of governmental and religious functions or a concert or dependency of one upon the other to the end that official support of the State or Federal Government would be placed behind the tenets of one or of all orthodoxies."

\* \* \*

"Applying the Establishment Clause principles to the cases at bar we find that the States are requiring the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison. These exercises are prescribed as part of the curricular activities of students who are required by law to attend school. They are held in the school buildings under the supervision and with the participation of teachers employed in those schools. None of these factors, other than compulsory school attendance, was present in the program upheld in Zorach v. Clauson. The trial court in No. 142 has found that such an opening exercise is a religious ceremony and was intended by the State to be so. We agree with the trial court's finding as to the religious character of the exercises. Given that finding, the exercises and the law requiring them are in violation of the Establishment Clause."

"The conclusion follows that in both cases the laws require religious exercises and such exercises are being conducted in direct violation of the rights of the appellees and petitioners."

\* \* \*

"Further, it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutrality that is today a trickling stream may all too soon become a raging torrent and, in the words of Madison, 'it is proper to take alarm at the first experiment on our liberties.' "

Justice Douglas stated in his concurring opinion:

*"The most effective way to establish any institution is to finance it; and this truth is reflected in the appeals by church groups for public funds to finance their religious schools.* Financing a church either in its strictly religious activities or in its other activities is equally unconstitutional, as I understand the Establishment Clause. Budgets for one activity may be technically separable from budgets for others. But the institution is an inseparable whole, a living organism, which is strengthened in proselytizing when it is strengthened in any department by contributions from other than its own members." (Emphasis in the original.)

Probably much of this language would have been included in

"The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between church and State.' *Reynolds v. United States, supra* at 164."

Justice Clark wrote the opinion in *Schempp*. In part, it stated:

"The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. *Everson v. Board of Education, supra*."

The first quotation was repeated in *McCollum, supra,* and portions thereof were likewise repeated in *McGowan v. Maryland,* 366 U. S. 420, and *Torcaso v. Watkins,* 367 U. S. 488. In *Zorach v. Clauson,* 343 U. S. 306, the Court upheld the con-

the majority opinion, had a direct grant, or direct expenditure, of money been involved.

stitutionality of a "released time" for religious instruction program (there being no expenditures of public funds or use of public buildings), stating, however, "government may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education * * *." And in *Engel, supra,* as stated in footnote 14, the Court said when "the power, prestige and financial support of government is placed behind a particular religious belief," the Establishment Clause is violated.

The Chancellor read the *Schempp* opinion as setting forth a new and comprehensive test to apprehend what was constitutionally permissible and impermissible under the Establishment Clause. We do not read the opinion in that manner. We do not read it as establishing a completely new test, nor one that can be applied in all cases as a final and determinative one. *Schempp* did not involve a direct expenditure nor a direct grant of money.[15] We read the test therein mentioned as being sufficient to decide the issues there involved, and, as the factual situation showed that the statutes could not even pass the test named, no more was needed to be said or added thereto. In other words, the statutes there involved clearly showed that their "purpose and primary effect" was the advancement of religious exercises. If either their "purpose" or "primary effect" were such advancement, the statutes were unconstitutional, and, as they offended in both aspects, that determined the issue; so why add hypothetical tests attempting to cover all conceptual factual situations, such as where secular and sectarian exercises are fused or commingled, etc.?

It is inconceivable to us that *Schempp* was intended *sub silentio* to overrule or supersede *Everson* and the other Establishment cases preceding *Schempp*. On the contrary, *Everson* is cited in the opinion, with approval, some half dozen times. (In fact, *Everson,* is cited as the authority for naming the test.) At one point, after quoting, with approval, from *Everson;* from Justice Jackson's dissent therein to the effect that the First Amendment "was to take every form of propagation of religion

15. Justice Douglas was the only member of the Court who felt that even though the public expenditure was minuscule, it was sufficient to invalidate the statutes involved.

out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayer's expense * * *"; from Justice Rutledge's dissent therein which declared, "but the object was broader than separating church and state in this narrow sense, [i]t was to create a complete and permanent separation of the spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion"; the Court went on to say (in *Schempp*) "the same conclusion has been firmly maintained ever since that time [citing *McCollum*, *McGowan* and *Torcaso*, all *supra*]." (Emphasis added.)

After a consideration of all of the Supreme Court decisions and our statement of their rationale, quoted above, we have reached the conclusion that, insofar as the issue of the First Amendment is concerned, we should apply the following standards in measuring the statutes under consideration.

As it is claimed that First Amendment liberties have been infringed upon, we must closely scrutinize and carefully consider the issues presented. *McGowan, supra,* 366 U. S. at p. 449. Each case must be determined on its particular facts. *Murray, Etc., supra,* 341 Md. at p. 398. We must examine each of the statutes and decide whether it can be demonstrated that its purpose—as evidenced either on its face, in conjunction with its legislative history, or in its operative effect—is to use the State's coercive power to aid religion. *Schempp, supra,* 374 U. S. 203, and Justice Frankfurter's opinion in *McGowan,* 366 U. S. at pp. 466, 467. "If the primary purpose [as contradistinguished from an incidental one] of the state action is to promote religion, that action is in violation of the Amendment, but if [the operative effect of] a statute furthers both secular and religious ends, an examination of the means used is necessary to determine whether the state could reasonably have attained the secular end by means which do not further the promotion of religion." *Murray, Etc., supra.* Cf. *McGowan, supra.* No tax, in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called or whatever form they may adopt to teach or practice religions. *Everson, supra,* 330 U. S., at p. 16. Although a state cannot "contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church,"

it cannot exclude individuals, because of their faith or lack of it, from receiving the benefits of valid public welfare legislation. *Everson, supra,* (a case wherein the Court stated the factual situation "verged" upon the impermissible). When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain. *Engel, supra,* 370 U. S., at p. 431. We are unable to accept appellees' contention that every religious observance by an institution sectarianizes the same, but feel that the question of sectarianization depends upon a consideration of the observances, themselves, and the mode, zeal, and frequency with which they are made. These principles are sufficient, we think, to determine our present issues, and we shall apply them in considering the four statutes involved.

We have comparatively little difficulty with such cases as *Bradfield v. Roberts,* 175 U. S. 291, *Quick Bear v. Leupp.* 210 U. S. 50, and *Cochran v. Louisiana, etc.,* 281 U. S. 370, all cited by the appellees. We shall make but a short analysis of the same. Justice Brennan, in his concurrence in *Schempp, supra,* said: "A scrutiny of several earlier cases [including the three cases named above] * * * shows that such cases neither raised nor decided any constitutional issues under the First Amendment." We agree.

And we find no great difficulty in distinguishing *McGowan v. Maryland, supra,* wherein the validity of the Maryland Sunday-closing laws were upheld. There, general "public welfare legislation" was upheld because its then "present purpose and effect" was "to provide a uniform day of rest for all citizens," even though religion might have been affected or benefited in a purely incidental manner. It was much the same holding, in principle, as *Everson, supra,* wherein the Court observed that the legislation "verged" upon being impermissible. As we have stated above, it is a question of degree as to how far all religions or a specific religion may be benefited by State action without the State stepping out of its role of complete "neutrality," and such action losing its character as being incidental to lawful general welfare legislation.

## APPLYING THE STANDARDS TO THE INDI-
## VIDUAL COLLEGES

There is little controversy over the facts in any of the cases; rather the dispute is as to the legal effect of the facts.

The experts on both sides are in general accord that the following factors are significant in determining whether an educational institution is religious or sectarian: (1) the stated purposes of the college; (2) the college personnel, which includes the governing board, the administrative officers, the faculty, and the student body (with considerable stress being laid on the substantiality of religious control over the governing board as a criterion of whether a college is sectarian) ; (3) the college's relationship with religious organizations and groups, which relationship includes the extent of ownership, financial assistance, the college's memberships and affiliations, religious purposes, and miscellaneous aspects of the college's relationship with its sponsoring church; (4) the place of religion in the college's program, which includes the extent of religious manifestation in the physical surroundings, the character and extent of religious observance sponsored or encouraged by the college, the required participation for any or all students, the extent to which the college sponsors or encourages religious activity of sects different from that of the college's own church and the place of religion in the curriculum and in extra-curricular programs; (5) the result or "outcome" of the college program, such as accreditation and the nature and character of the activities of the alumni; and (6) the work and image of the college in the community.

With these criteria and the standards we named above in mind, we consider the schools, individually. In setting forth the facts relevant to each, we have followed, in considerable measure, appellants' brief with reference to some of the schools, after carefully checking the same with the evidence.

### HOOD COLLEGE

Chapter 88 of the Acts of the General Assembly of 1962 grants to Hood College $500,000 to help erect a dormitory and a classroom building.

According to the College Bulletin issued in 1963, Hood is "an independent liberal arts college for women," and it "is

church related through its affiliation with the United Church of Christ [U.C.C.], but welcomes students of all religious faiths." It is listed in a Tabulation of the Danforth Foundation of Institutions Associated with Religious Bodies as "reflecting religious orientation." It is a small college, limited to an enrollment of about 650 students, and is governed by a Board of Trustees consisting of 35 members. Seven of these are elected by agencies of the U.C.C.; 22 by the Board itself; and 6 by the Alumnae Association from its membership. The President is selected by the Board, and the President, after screening by appropriate college officials, selects the administrative personnel. Faculty members are usually located by the chairman of the department where a vacancy occurs. They are selected upon an analysis of their academic credentials, qualifications, and earned degrees, and their "character and congeniality." There are no sectarian requirements for members of the faculty; the President thought that Hood had "virtually all shades of religious affiliations represented [thereon] and non-religious affiliation." In the year 1963-1964, there were 7 Episcopalians, 2 of the Jewish faith, 3 Lutherans, 6 Methodists, 1 with no affiliation indicated, 13 Presbyterians, 2 listed as Protestant but non-denominational, 5 Roman Catholics, 3 members of the Society of Friends, 3 Unitarians, and 10 members of the U.C.C., a rather heterogeneous faculty for a sectarian school.

There is no requirement that any member of the officers of administration be of any particular religious denomination, and, in fact, the officers of administration do not represent any particular church or religious body. Included among these are Baptists, Lutherans, Methodists, Presbyterians, one Roman Catholic and one Unitarian, and 7 members of the U.C.C.

There is no requirement that the Chaplain, who supervises, generally, the religious lives of the student body be of any particular denomination, although the present one is a member of the U.C.C.

The student body is primarily selected according to educational records supplied by the students and by the schools from whence they come; there is absolutely no requirement based on race, creed, color, or sectarian affiliation in the student body. An examination of their religious affiliation for the year 1963-

64 shows such a diversification that it would unduly prolong this opinion to include them all. Among a student body of some 675 students, were included 146 Episcopalians, 29 Jewish students, 83 Methodists, 72 Roman Catholics, 108 Presbyterians, and 89 members of the U.C.C.

The college confers only two earned degrees; the A.B. degree, which is, of course, a liberal arts degree; and the B.S. degree in Home Economics. It has a department of religion and philosophy; the courses taught therein are conducted in the same manner as the courses in other departments. These courses are not geared to aiding the Protestant religions or any other; they are primarily historical studies in religion and "there is absolutely no attempt at indoctrination in any way." The President was emphatic in stating that he believed proselytizing had no place in higher education. The professors in the religious field are not confined to members of the U.C.C. or to Protestants. In addition, there is no attempt by the U.C.C., or any other group, to select texts or to offer suggestions as to which texts should be used, and there are no courses in religion or philosophy, or anywhere else in the curriculum, which are designed to train for the ministry or religious work. The requirements for attendance at chapel (indeed, if they may be termed requirements from the evidence) do not call for frequent services, with the student being allowed generous "cuts" without excuse. On the Wednesday evening services, of which there are approximately 15 per semester, clergymen of various denominations come in and talk to the students. These include Protestants, Roman Catholics, Jewish Rabbis, and a Humanist (the President of Hood, after listening to him, being unable to state what his religious preference was). This same general pattern is followed for the Sunday evening services, but not to the same extent as the services on Wednesday evenings. The students are encouraged to maintain ties with the churches of their own denomination while at the college, and each Sunday morning they are released for the purpose of going to such churches in the locality.

In the year mentioned above, the U.C.C. contributed 2.2% of the college's total operating budget; but contributed nothing in the way of capital gifts, with the exception of one gift in the amount of $10,000 for endowed scholarships.

The college has a "very loose relationship" with the Council for Higher Education of the U.C.C., all of the church-related colleges related to the U.C.C. automatically becoming members of the Council.

During the summers the college permits various civic and religious groups to utilize their campus for programs for which modest charges are made. The school has no control over the programs, and, as far as the record discloses, the programs are not confined to church affairs or to any particular denominations.

The facilities to be housed by the grant herein involved will be a new academic building and a dormitory; no religious activities will be conducted therein.

The above summarization, we think, discloses that Hood, although it is a church-related school, may constitutionally receive the money mentioned in the Bill. No challenge under this heading is made against the Bill's permissibility other than its alleged violation of the Establishment Clause of the First Amendment.

Applying the criteria we named above, we are unable to say that the College is sectarian in a legal sense under the First Amendment, or to a degree that renders the grant invalid thereunder. The College's stated purposes in relation to religion are not of a fervent, intense, or passionate nature, but seem to be based largely upon its historical background. The College was established in 1893, when a great number of private schools were church-oriented, and it was then related to the Reformed Church of the United States. After two church mergers, one in 1933 and one in about 1962, the present sponsoring church is the newly created U.C.C. The Church does not have control over the governing body and certainly the college personnel shows no serious attempt to proselytize, or to require certain religious beliefs to become a member thereof. The financial assistance of 2.2% of the operating budget given by the Church is a moderate percentage. The only physical structure of a religious character seems to be the Chapel, and it is open to all. Religion in the curriculum and in extra-curricular programs is at a minimum for any church-related school. We do not find that religion occupies a dominant place in the College's pro-

gram, the record clearly showing that students are not required to attend and participate in many religious observances. It is, of course, accredited. The record does not disclose any great activity among the alumnae of a religious nature, and, although the image of Hood in the community is that of a good, sound, and efficient College, there is no showing that it is considered to be religiously slanted. Under the above circumstances, it is obvious that neither the U.C.C. nor any other religion is running the institution, or has control over it.

We hold, therefore, that the primary purpose of the grant here involved was not to aid or support religion; that there is nothing on the face of the Bill or its legislative history to demonstrate that its purpose was to use the State's coercive power to aid religion; and that its operative effect is not to aid religion (as we read the record, we see no aid to religion here; if there be any it assuredly is incidental and very remote in nature), but to promote the educational facilities for women. Consequently, the Bill does not violate the First Amendment.

## *WESTERN MARYLAND*

Chapter 546 of the Acts of the General Assembly of 1963 grants $500,000 to Western Maryland College for the purpose of aiding in the construction of a science wing and dining hall.

The stated purposes include religious objectives to a considerable extent. The college characterizes itself as a "religiously oriented institution" and "make[s] no bones about the fact that our philosophy at Western Maryland is a Christian philosophy."

One more than one-third of the members of the governing board are required by its Charter to be Methodist Ministers, so as to give the clergy the veto power over any change inimical to the interests of the church. The required percentage "binds the college very closely to the Church." The board is heavily Methodist, and nearly all Protestant, although quite a number of denominations are represented thereon. All the presidents have been Methodist Ministers. The administration is almost entirely Protestant, although, again, quite a number of denominations are represented.

Care is taken to obtain a faculty committed to the Christian philosophy of life, and an atheist would not be employed. Al-

most half of the faculty is Methodist, and almost all Protestant. Approximately 40% of the student body is Methodist, and almost all Protestant. The large number of Methodists is due to greater likelihood of acceptance of Methodist "borderline cases * * * because they seem part of the constituency of the college," and to the large number of Methodist students who become familiar with the college during church conferences on the campus. The college has a significant number of Methodist pre-ministerial students. Some of these are given scholarships ranging from $\frac{1}{2}$ to full tuition. And the children of Methodist Ministers are charged only half tuition.

The church provides "financial support of considerable value," both operational and capital, the operational contribution being between 2 and 3% of the budget. The college is affiliated with, and supports, denominational educational associations.

The college campus is very heavily used by Protestant religious groups (some at actual cost), and "logically and naturally, there have been of course more of the Methodist program here than any of the other denominations."

The college fosters a religious program, under the direction of a Methodist Minister. Participation in Protestant religious services is required of all students. The requirement is publicized so that if anyone has conscientious scruples about attending such services "he should know that before he comes."

The college makes a conscious effort to integrate religion, and specifically Christianity, with the curriculum and extra-curricular life. Because Methodism does not have the wide range of dogma that one, or more, religions have, there is less specific religious restriction in regard to curriculum, but the school endeavors to provide a religious motivation.

We quote briefly from material contained in documents issued by the College: "Many [of the students] become seriously interested in religion for the first time [while attending the college]."

Under the heading "What Has the College Done For The Church," after listing what we have named above, we find the following:

"The principal contribution the College is making to the Church is in accordance with its [the College's]

basic purpose: to provide the best in higher educa-tion *within the framework and atmosphere of the veri-ties and values of our Christian faith.*" (Emphasis added.)

The college is accredited by the Middle States Association of Schools and Colleges and the University Senate of the Method-ist Church. It is proud of the number of its alumni who enter the Christian, and particularly the Methodist ministry. The im-age of the college in the community is strongly Methodist.

Applying the criteria and principles of law we named above to this College, we reach the conclusion that it is sectarian in a legal sense under the First Amendment, and may not con-stitutionally receive the grant named in the Bill. Whether or not an educational institution is sectarian in such a legal sense is a rather elusive matter, being somewhat ephemeral in nature. Hence, we have deliberately made no attempt to enunciate a hard, fast, and intractable rule in regard thereto, preferring, as indicated above, to decide each case upon the totality of its attendant circumstances.

Here, the stated purposes of the College have a distinctly re-ligious "flavor," and they clearly indicate a considered reso-lution to promote religious activities and exercises. The Board of Trustees consists of 27 Methodists in a membership of 40, with virtually all of the remainder being Protestants. And, of course, at least one more than one-third must be Methodist Ministers, which "binds the college very closely to the Church." The administrative officers are almost entirely Protestant; and the full-time faculty consists of 30 Methodists in a membership of 51.

We shall not repeat all of what we said above concerning the College's activities. We find nothing on the face of the bill or its legislative history to demonstrate a purpose to use the State's coercive power to aid religion, but a careful considera-tion of all the facts impels us to the conclusion that the opera-tive effect will be such, if the grant be effectuated. As stated in footnote 14, "The most effective way to establish any institu-tion is to finance it * * *. Financing a church either in its strictly religious activities or in its other activities is equally unconstitutional * * *." When it is conceded that all the Presi-

dents have been Methodist ministers, that many of the students become seriously interested in religion for the first time, that limited scholarships are given to the children of the ministers of one denomination, that scholarships are awarded to pre-ministerial students of one denomination, that its campus is made available, at cost, to organizations belonging to one faith, that preference is given to "borderline cases" of one denomination in student-body selection, and that the "basic purpose" of the College is to provide the best in higher education "within the framework and atmosphere of the verities and values of *our* (emphasis ours) Christian faith," et cetera, how can it seriously be argued that a grant of tax-raised funds to such an institution would not be "to support * * * religious activities or institutions, whatever they may be called or whatever form they may adopt to teach or practice religion"?

Moreover, the College has made no attempt (possibly due to the fact that the opinion had not been filed when the testimony herein was taken) to comply with the requirements set forth by this Court in *Murray, Etc., supra, i.e.,* "if a statute furthers both secular and religious ends, an examination of the means used is necessary to determine whether the State could reasonably have attained the secular end by means which do not further the promotion of religion." The appellants suggest that the State could have accomplished the secular purpose desired, without the question of religious activities becoming involved, by making the same grant to any one of several non-sectarian educational institutions in the State.

Without laboring the question further, we hold that Chapter 546 transgresses the proscriptions of the Established Clause, consequently, it is unconstitutional and invalid.

## NOTRE DAME

Chapter 66 of the Acts of the General Assembly of 1962 grants $750,000 to this College to aid in the construction of a science building.

Notre Dame's stated purposes are deeply and intensely religious. The theory of Catholic education is that Prayer, Holy Mass and the Sacraments represent "the Unifying forces," and "the instructional program interlocks with the non-instructional program; objectives with methods and means, and all to an es-

sential, interwoven unity." "All of [the College's] objectives are implemented in some degree in every department." The institution's whole life is lived in the Catholic atmosphere, which assumes that earthly life is to be lived * * * in terms of a preparation for the future life with God," and to that end, it "harmonizes" its entire "program with the philosophy and theology of the Catholic Church." The entire program of the College is so ordered "that [the student's] life and study and the atmosphere of the college are *permeated, motivated, enlarged and integrated by the Catholic way of life* as developed and expressed in the daily prayer, liturgy, Sacraments and Holy Mass of the Church." (Emphasis ours.) "And Outward Grace * * *. Since the Christ-thought, the Christ-word and the Christ-deed are the norms of community living in a Catholic college for women, intimations of this presence should be found everywhere: In the Chapel—[and] in the Class Room * * *." "This expresses our aim to have the spiritual support and vivify the whole college atmosphere." Extracts taken from Exhibits in evidence. "God bless you and your apostolate in the home, classroom, laboratory, business office, etc. Gratefully in Our Lady." (Sentence from a letter of Sister Miriam to the Girls of 1961.) "Make your payment a Christmas Gift this year. Help meet the $750,000 Matching Grant for the Science Building [the building involved in the grant under Chapter 66]. * * *. And you know that your gift to the College is a gift to God for the furtherance of his work. May the Christ Child bless you for your generosity * * *." (Letter from Sister Miriam dated December, 1962).

If erected, each class in the new science building will open with a prayer.

The governing board is controlled by a Catholic religious order whose members are completely committed to Catholic discipline and educational philosophy. The administration is almost entirely religious. The faculty are predominantly nuns who are appointed by the Provincial Superior of the religious order (who is Chairman of the governing board), in consultation with the President, who is also a member of the order. Administration and faculty are chosen on the basis of commitment to the college objectives and ideals, and are overwhelmingly Catholic. Ten per cent of the students are candidates for a re-

ligious order and more than 97% of the whole student body are Catholic. This percentage cannot be deemed coincidental.

The college is owned and has been given heavy financial assistance by the religious order. It it officially a member of, and supports, a number of distinctly Catholic associations and institutions. It makes its campus available for use by the Catholic Church and related groups, but not to non-Catholic organizations. It has close ties with the Archdiocese of Baltimore.

Catholicity permeates the college program: the physical surroundings; the rich variety of college-sponsored, exclusively Catholic observances, many of which are compulsory for Catholic students, if not for the entire student body; the curriculum; extracurricular activities; and the student advisory and counseling program.

The college and the accrediting agencies report a high level of success in achieving the religious objectives of the institution. The alumnae, individually and as an organization constituting "an integral part" of the college activity, are deeply engaged in the promotion and defense of Catholicism and the Catholic Church.

The college provides supplemental programs of strong Catholic religious content for nuns teaching in parochial schools and in its Adult Institutes for the community at large. Its image in the community, as expressed in its publications, constituencies, relations with the Archdiocese, ceremonies, and way of life in general, is distinctly and intensely Catholic.

As the situation presented by the facts relating to St. Joseph College are so analogous to those regarding Notre Dame, we set forth St. Joseph's fact picture before stating our holdings with reference to Notre Dame.

## ST. JOSEPH COLLEGE

Chapter 545 of the Acts of the General Assembly of 1963 grants to St. Joseph College $750,000 to assist in erecting a science building.

Since the evidence relating to this institution is so similar to that regarding Notre Dame, we curtail, somewhat, our analysis thereof.

The stated purposes of St. Joseph College seem to be even more strongly religious than Notre Dame's. The religious order

of dedicated nuns has complete control of the government and administration. The nuns have taken and abide by vows of strict obedience. The faculty is chosen with a view to achieving the religious ideals of the college, both by precept and example, and preference is given to Catholics; it, as a whole, is sympathetic to the Catholic philosophy of education. The majority of the faculty are Catholic priests or nuns, and there are but a small number of non-Catholic members. The student body includes candidates for the religious order, and has consistently been virtually 100% Catholic; approximately 90% of the students are graduates of Catholic parochial high schools. The Catholic character of the student body is achieved by design.

The religious order owns the college through the corporate form and has provided virtually 100% of the financial assistance needed over and above operating income.

The college is affiliated with, and supports, distinctly Catholic associations and institutions, and, like Notre Dame, is a certified affiliate of the Catholic University of America. The supplementary uses of the campus have been exclusively by Catholic religious groups.

The physical surroundings are strongly religious. Religious observance is strongly Catholic, richly textured, and extensively participated in: "In general, the Theocentric orientation of a Christian student's life is encouraged."

The accrediting agencies have specifically found St. Joseph to be accomplishing its religious objectives. The alumnae, individually and as an organization, are distinguished by the number of member of religious orders, the high percentage of active Catholic workers, and the devotion to the alumnae association's objectives: "to promulgate the principles and ideals of Catholicism * * * defending and promoting the interest of the Church, in promulgating Catholic education and in supporting the Church and its activities."

The supplementary instructional programs are strongly Catholic, as is the image of the college in the community.

If erected, the new science building will house crucifixes, "maybe" statues, and "very likely" waterfonts.

Again, we find nothing on the faces of the above two Bills or in their legislative histories to demonstrate a purpose to use the State's coercive power to aid religion, but a consideration of

the totality of attendant circumstances impels a conclusion that their operative effect (if the grants be effectuated) demonstrates such a purpose. It must be remembered that here involved are direct grants of tax-raised funds to the educational *institutions*, themselves, which will become the sole owners of the buildings if erected. If appellees' contention that there is nothing in the Establishment Clause which proscribes direct grants to aid and support sectarian educational institutions were correct, it seems that *Everson, supra,* would have been decided quite easily and without dissent, even though no direct grant was there involved. The funds here involved are entirely different from those in such cases as *Board of Education v. Wheat,* 174 Md. 314, and *Everson, supra.* In *Everson,* the Supreme Court ruled that a State could constitutionally finance bus transportation of children to parochial as well as public schools, on the ground that involved was "public welfare legislation" (protecting *all* children from traffic hazards and dangers), and under the provisions of the First Amendment no State could exclude individuals, *because of their faith,* from receiving the benefits of such legislation. In *Wheat,* this Court ruled constitutional a statute which required the Board of Education (under limitations as to distance, etc.) to carry parochial students to and from their schools upon the same conditions that public-school students were carried, on the ground that the statute protected the safety of the children while en route to and from schools. No direct grants of money or property to any educational institution were involved in either case, but the Supreme Court split 5 to 4 and this Court 5 to 3 on the issues, with vigorous dissents being filed in each case.

In basing its holding in *Everson* on public welfare legislation, the Supreme Court was careful to say:

"New Jersey cannot consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution [directly involved therein were students in parochial educational schools—no church, or institution set aside especially for religious worship, was involved] which teaches the tenets and faith of any church."

And "no tax in any amount, large or small, can be

levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to preach or practice religion."

We do not deem it desirable to add materially to what we have already said with reference to Western Maryland. The facts relating to Notre Dame and St. Joseph speak for themselves. We think they clearly show that the operative effect of the Bills (if the grants are permitted to be made) demonstrates, in a legal and constitutional sense, a purpose to use the State's coercive power to aid religion; that the grants, if made, would constitute a contribution by the State of tax-raised funds to support institutions which teach the tenets and faith of a particular church; and that the taxes levied to raise the funds for the grants would be levied to help support religious activities and religious institutions.

We agree with Neil J. McCluskey, S. J., in his work *Catholic Viewpoint on Education*, p. 168, wherein he stated: "The Catholic laity and clergy are fully aware that direct basic support by the government to parochial schools is out of the question" because "the U. S. Supreme Court would interpret such action as a contravention of the Federal Constitution."

We, therefore, hold that both Notre Dame and St. Joseph are sectarian in a legal sense under the First Amendment, and neither can constitutionally receive the grant made to it; hence Chapter 66 of the Acts of 1962 and Chapter 545 of the Acts of 1963 are unconstitutional and invalid.

## THE MARYLAND CONSTITUTIONAL CLAIMS.

Under some circumstances, it would be unnecessary to consider these contentions after our holdings above, but, should we find that the grants violated the Maryland Constitution, the Supreme Court might assume a different attitude with reference to reviewing our conclusions than if we decide to the contrary; so we deem it desirable to answer the same.

Article 23 of our Declaration of Rights provides, *inter alia*, that no man should be deprived of his life, liberty, or property except "by the judgment of his peers, or by the Law of the land." Appellants point this out and call attention to the fact that we have held the phrase "Law of the land" herein is the equivalent of "due process of law" as used in the Fourteenth

Amendment to the Federal Constitution. They then argue, "for the same reasons, and on the same authorities, as the grants violate the Fourteenth Amendment's guarantees of due process of law, which have been construed to include *the prohibition against an establishment of religion contained in the First Amendment* (emphasis ours), the grants violate Art. 23 * * *."

It is quite true that we have equated the phrases "Law of the land" and "due process of law." See for example *Matter of Easton*, 214 Md. 176. But the argument loses sight of the fact that the First Amendment is not included in the Maryland Constitution, and we do not have a Court of higher authority than the Court of Appeals to construe our Constitution, which, of course, is not the case when the Federal Constitution is involved. We have found no Maryland case denying the right of the Legislature to make a grant to a private institution provided the money is appropriated and expended for a public use. Cf. *Johns Hopkins Univ. v. Williams*, 199 Md. 382; *Saint John's College v. Maryland*, 15 Md. 330; *St. Mary's Industrial School v. Brown*, 45 Md. 310; *Board of Education v. Wheat, supra; Adams v. St. Mary's County*, 180 Md. 550. The grants here under consideration (if effectuated) are clearly ones to be expended for public uses: to assist in educating our citizens. Cf. *Johns Hopkins Univ. v. Williams, supra.* We, therefore, hold that none of the statutes involved violates Article 23.

What we have just said answers appellants' contentions in regard to Article 15. It is true that under this Article the Legislature is inhibited from imposing taxes other than for public purposes. *Baltimore & E. S. R. R. Co. v. Spring*, 80 Md. 510. It is also true that it has been said that what is a public purpose for which tax funds may be expended is not a matter of exact definition; it is almost entirely a matter of general acceptation. *Finan v. M. & C. C. of Cumberland*, 154 Md. 563. But at least since the *Johns Hopkins Univ.* case, *supra*, it cannot be doubted that gifts to private educational institutions to aid in the construction of school buildings are expenditures for public purposes. In the above case it was not even argued that the gift was not an expenditure for a public purpose.

We hold that none of the Acts violates Article 15.

This brings us to a consideration of the final contention to be answered: do the grants violate Article 36, which, in part, provides: "nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry."

Appellants call attention to the similarity of the language just quoted to that in Jefferson's famous Bill passed in Virginia, *supra* (see it also as Document 10, Am. Jur. 2d, Desk Book), cite several out-of-state cases that are rather closely in point, and claim the grants herein violated Article 36. In the light of the history and reasons for the separation-of-church-and-State provisions and the broad scope given the First Amendment by the Supreme Court cases beginning with *Everson, supra,* it cannot be said that the contention is entirely lacking in force, and if it were presented to us as an entirely new proposition, it might raise some doubt as to how it should be answered. Although there does not seem to be any previous decision of this Court directly in point, we think an examination of how, why, and when the provision first came into our Constitution, the changes therein subsequently made, and the decisions of this Court bearing in some degree on the meaning of the provision compel a conclusion that Acts herein involved do not violate Article 36.

Our first Constitution was adopted in 1776, 10 years before Jefferson's Bill referred to above and 11 years before the adoption of the Federal Constitution. This first Constitution granted religious tolerance to all those of the Christian faith; and, with reference to compelling support therefor had substantially the same provision as our current one. Prior to 1776, it had been the practice in Maryland to levy taxes for the support of the Christian religion and also to support the clergy of the Church of England. Article XXXIII of our first Declaration of Rights (the precursor of the present Article XXXVI), after granting tolerance to those who professed the Christian religion, as we pointed out above, provided that no person ought to be compelled to frequent, maintain, or contribute to maintain any *particular* place of worship or any *particular* ministry. Immediately following, it stated that the Legislature could lay a "general and equal tax for the support of the Christian religion," with the right in the individual taxpayer of "appointing over" the money paid by him "to the support of any particular place of

worship or minister * * *." It further provided that the Acts, lately passed, for collecting monies for building or repairing particular churches or chapels should continue in force, and that every encumbent of the Church of England should be entitled to receive "the provision and support established by the act, entitled, 'an act for the support of the clergy of the church of England, in this Province.' "

Notwithstanding the passage of Jefferson's Bill establishing religious freedom and preventing taxation to support any "religious worship, place or ministry" in Virginia in 1786 and the adoption of the First Amendment in 1791 (which at that time did not apply to the states), it was not until 1810 [16] that the people of Maryland saw fit to take away the authority of the Legislature to tax to support churches or ministers by amendment of the Constitution. This amendment provided "that it shall not be lawful for the general assembly * * * to lay an equal and general tax, or any other tax * * * for the support of *any religion*." (Emphasis added.) The Constitution of 1851 granted tolerance and religious liberty to "all persons," and changed the provision under consideration from "any particular place of worship, or any particular ministry" to "any place of worship or any ministry," as it is today.

We have given this brief background of Article 36 to show that Maryland was obviously in no great hurry to prevent taxation to support certain religions or to grant religious tolerance to all persons, no matter what might be their faith or lack of faith. We indicated above that there are several decisions of this Court that have some bearing upon the issue now under consideration. We shall name some of them. *Wheat, supra,* involved free transportation of children to parochial schools on public-school buses. The Act was challenged as being one that levied taxes for a private purpose, and as being violative of Article 36. After finding that the Act was sustainable under the police power as providing for the safety of children and aiding in enforcing the law requiring children of certain ages to

---

16. Four of appellees stated: "It was not until the Constitution of 1851 that the authority of the Legislature to tax for the support of the Christian religion was eliminated." This apparently is in error. See Niles, Maryland Constitutional Law, p. 379; 1 Poore, Charters & Constitutions (1878), 832.

attend school, the Court stated, "this conclusion * * * renders it unnecessary to consider separately the objection that a religious institution is aided. Art. 36 * * *. The institution must be considered as aided only incidentally, the aid only a by-product of proper legislative action." This, by implication, was a strong indication that the Court did not consider the Act to violate Article 36, for the Legislature, even in the exercise of the State's police power, cannot transgress specific constitutional inhibitions; hence, had the Act violated Article 36, it would not have been constitutional legislation.

Then there are the cases of *St. John's College v. State*, 15 Md. 330, *St. John's College v. Purnell*, 23 Md. 629, *Allegany County School v. Maffit*, 22 Md. 121, *St. Mary's Industrial School for Boys v. Brown*, 45 Md. 310, 335, 336, *Clark v. Maryland Institute*, 87 Md. 643, *Baltimore v. Keeley Institute*, 81 Md. 106, *Finan v. M. & C. C. of Cumberland*, 154 Md. 563, and possibly others. We shall not analyze the holdings in each of these, for we think Judge Parke, for the dissenting members in *Wheat, supra,* correctly summarized them. He stated:

> "Thus appropriations by the General Assembly of public funds are customarily made and paid to various bodies and institutions throughout the state, which are privately owned and managed, and which are, in many instances, of sectarian origin and character. It will be found, upon examination, that this employment of public funds has not been for a private purpose but for a public one. It is upon this ground that this employment of public moneys has been sanctioned by the decisions of this court. If an incidental or direct benefit result to the recipient, this resultant advantage becomes immaterial and negligible because of the paramount public and essential nature of the service rendered and of the further factor that the State has either not undertaken or not fully assumed the performance of the public service or function involved. [citation]. *The validity of such grants, when so limited, is not affected by any sectarian circumstance.* [citation] Thus, *grants to educational institutions* which supply instruction and training in learning and mechanical, industrial, agricultural and others arts of which the

State does not offer or undertake to afford universal service [there is no contention that Maryland has ever adopted universal public instruction at the college level] are freely made without reference to whether the recipient be denominational or otherwise. [citation of Maryland cases and legislative grants] Similarly, the grants in aid of the hospitalization of patients for care and treatment in sickness, injury and disease, [citation] for chronic alcoholism, [citation] for homes for the aged and infirm, for orphans, for children, for the blind, for crippled children, for reformatories and for other purposes which are within the functions of the State as conducive to the welfare of its inhabitants, and pursuant to the mandate of the Declaration of Rights: 'That the Legislature ought to encourage the diffusion of knowledge and virtue, the extension of a judicious system of general education, the promotion of literature, the arts, sciences, agriculture, commerce and manufactures, and the general amelioration of the condition of the people.' Article 43.

"In these grants the State advisedly *makes no distinction between denominational and non-denominational institutions,* nor has it limited its appropriations to race or color. The grants so made for special public purposes find at once their justification and vindication in the promotion of the general welfare in those matters of public concern in respect of which the government had not theretofore undertaken completely to perform. In short although paid to a private person, the money is appropriated and expended for a public use." (Emphasis supplied.)

We also see some relationship to our present issue in the holdings in *Baltzell v. Church Home,* 110 Md. 244 (upholding a bequest to the Church Home & Infirmary of Baltimore City, at a time when the Constitution required legislative sanction for gifts, with certain exceptions, to any "religious sect, order or denomination.") and *Mt. St. Mary's College v. Williams,* 132 Md. 184, wherein the College was held not to come within the purview of being a religious sect, order or denomination. Both of these cases followed the lead of *Speer v. Colbert,*

24 App. Cas. (D. C.) 187, aff'd 200 U. S. 130, wherein George-
town College, which was an educational institution under the
control of a religious order, known as the Order of Jesus, was
held not to be a sectarian institution or a religious sect, order
or denomination. This last case has especial significance, for
the law in the District of Columbia was then the same as in
Maryland, and the opinion was one of the last of its then Chief
Justice Alvey, who had formerly been a most distinguished
Chief Judge of this Court and was thoroughly familiar with
Maryland law.[17]

Thus it is seen that grants to educational institutions at a
level where the state has not attempted to provide universal
educational facilities for its citizens have never, in Maryland,
been held to be impermissible under Article 36, even though
the institutions may be under the control of a religious order.
And we see no reason to hold otherwise now. We, therefore,
hold that none of the grants violates Article 36.

This conclusion is bolstered by the fact that all of the states,
except Maryland and Vermont, have explicit provisions pro-
hibiting the appropriation of public money to schools controlled
by religious organizations. See Note Yale 50 L.J. 917 for 46
of them, and we are informed that the Constitutions of Alaska
and Hawaii have explicit provisions also. Had the people of
Maryland desired to change its practice relative to such grants,
it certainly would be likely that they would have made similar
provisions after so many states had done so.

Also, the Department of Health, Education and Welfare
Misc. Doc. No. 28, *The State and Non-Public Schools,* pp.
16-17 filed as Plaintiffs' Ex. 113, cites Maryland as having no
specific provisions against grants to religious schools.

> *Decree affirmed in part, and reversed
> in part; and cause remanded for
> the entry of a decree in accordance
> with this opinion. The costs to be
> paid ¼ by the appellants, ¼ by
> Western Maryland College, ¼ by
> St. Joseph College, and ¼ by
> Notre Dame College.*

---

**17.** And, incidentally, he was also a member of the Constitutional
Convention which adopted the Constitution of 1867.

HAMMOND, J., filed the following opinion, dissenting in part, in which HORNEY and MARBURY, JJ., concurred.

I agree with my brethren of the majority that the individual appellants have standing and that the capital grants under review do not offend or violate Art. 15, Art. 23 or Art. 36 of the Maryland Declaration of Rights. I cannot agree with their conclusions that the grants by the State of Maryland to Western Maryland College for buildings to be used as a science wing and a dining hall and to St. Joseph College and the College of Notre Dame of Maryland for science buildings, amount to the establishment of religion by the State contrary to the mandate of the first amendment to the Constitution of the United States, made binding on the states, under the decisions of the Supreme Court, by the fourteenth amendment.

There can be no rational doubt from the evidence in the record and facts that properly can be judicially noted, of the following:

(1) that the State of Maryland has for over a hundred and eighty years followed a general, systematic and non-discriminatory pattern of financial assistance to private institutions furnishing a higher secular education. In 1784 the Legislature granted an annual sum of 1250 pounds for the use of St. Johns College (Ch. 37). By Ch. 107 of the Laws of 1798 there was authorized an annual grant to Charlotte Hall School (which had been founded by the established church before the Revolution). In *Johns Hopkins Univ. v. Williams,* 199 Md. 382, 399-400, Chief Judge Marbury, for the Court, listed capital grants by the State to institutions of higher learning in Maryland from 1904 to 1937.[1]

---

1. "Thus, in 1904, nearly fifty years ago, a public building loan in the amount of $1,625,000 was authorized by Chapter 228 of the Acts of that year. Of that amount $57,000 was for the purpose of construction and completion of buildings for the Maryland Agricultural College, which was the collegiate predecessor of the University of Maryland at College Park. At that time, the Maryland Agricultural College was a semi-public institution, having both public and private stockholders, and one-half of its property was owned by the State, so that the appropriation to it is not, perhaps, a perfect legislative interpretation. However, in the same act, $5,000 was given for the construction of buildings at Charlotte

(2) that under both Maryland law and federal constitutional standards such grants are for a public use and purpose. The Maryland Declaration of Rights provides in the opening sentence of Art. 43:

"That the Legislature ought to encourage the diffusion of knowledge and virtue, the extension of a judi-

---

Hall School, a privately owned institution, $5,000 for construction of St. Mary's Academy, a similar institution, and $175,000 for the purchase of a lot of ground in Baltimore for the Maryland Institute, also a private institution, and for the construction of a building thereon. This was followed in 1912 by Chapter 90 of that year, which provided for the issuance of $600,000 worth of the State's bonds, the proceeds of which were to be paid to the Johns Hopkins University for the erection of a technological school. That act also included an annual appropriation for maintenance, and provided for scholarships, and it might possibly be argued that the scholarships constituted a consideration. However, in 1922, by Chapter 464, a general construction loan of $1,750,000 provided for a gift from the proceeds of $20,000 to St. John's College for a new heating plant, and $30,000 to Washington College for and on account of its indebtedness. In 1924, there were four acts passed. Chapter 274 authorized a St. John's College loan in the amount of $110,000, the proceeds of which were to pay the present indebtedness of the college. Chapter 280 created a state debt of $2,460,000, and of the proceeds $100,000 was given to St. John's College for equipment and necessary construction purposes. By Chapter 366, the Western Maryland College loan of $125,000 was created, to be turned over to the Board of Trustees of Western Maryland College for the construction and equipment of a science building. By Chapter 369, a state debt of $100,000 was authorized, proceeds to be given to the Board of Visitors and Governors of Washington College for equipment and construction. In 1927, by Chapter 666, the Morgan College loan of $125,000 was created, the proceeds to be used for the construction and equipment of an industrial science building at Morgan College, then a private institution, but later acquired by the State. In 1937, by Chapter 487, a general bond issue of $9,052,000 was authorized, of which $162,000 went for the construction of buildings at Bowie Normal School, and $25,000 for the construction of an improved water supply at the Maryland Training School for Boys. In 1929, by Chapter 263, a state debt of $50,000 was created, to be used for the payment of the deficit in constructing and equipping the new buildings at Charlotte Hall School. All of these recipients were private non-profit corporations."

cious system of general education, the promotion of literature, the arts, sciences, agriculture, commerce and manufactures, and the general melioration of the condition of the People."

In his dissent in *Board of Education v. Wheat,* 174 Md. 314, 335-37, Judge Parke well summarized practice and law in a discussion, as to the correctness of which, there can be no real disagreement. He said:

"Neither the payment of money by the State to a private person, whether corporate or otherwise, nor the nature and occupation of that person, is determinative of the purpose of the payment. Thus appropriations by the General Assembly of public funds are customarily made and paid to various bodies and institutions throughout the state, which are privately owned and managed, and which are, in many instances, of sectarian origin and character. It will be found, upon examination, that this employment of public funds has not been for a private purpose but for a public one. It is upon this ground that this employment of public moneys has been sanctioned by the decisions of this court. If an incidental or direct benefit result to the recipient, this resultant advantage becomes immaterial and negligible because of the paramount public and essential nature of the service rendered and of the further factor that the State has either not undertaken or not fully assumed the performance of the public service or function involved. *Clark v. Maryland Institute,* 87 Md. 643, 41 A. 126; Article 43 of Declaration of Rights. The validity of such grants, when so limited, is not affected by any sectarian circumstance. *St. Mary's Industrial School for Boys v. Brown,* 45 Md. 310, 335, 336. Thus, grants to educational institutions which supply instruction and training in learning and mechanical, industrial, agricultural and other arts of which the State does not offer or undertake to afford universal service are freely made without reference to whether the recipient be denominational or otherwise.

*St. John's College v. State,* 15 Md. 330; *St. John's College v. Purnell,* 23 Md. 629; *Allegany County School v. Maffit,* 22 Md. 121 * * *.

\* \* \*

"In these grants the State advisedly makes no distinction between denominational and non-denominational institutions, nor has it limited its appropriations to race or color. The grants so made for special public purposes find at once their justification and vindication in the promotion of the general welfare in those matters of public concern in respect of which the government had not theretofore undertaken completely to perform. In short, although paid to a private person, the money is appropriated and expended for a public use."

In *Everson v. Board of Education,* 330 U. S. 1, 7, 91 L. Ed. 711, 719, Justice Black, for the majority of the Court, found New Jersey constitutionally could tax A to reimburse B for the cost of transporting B's children to a church school. He said:

"It is much too late to argue that legislation intended to facilitate the opportunity of children to get a secular education serves no public purpose. *Cochran v. Louisiana State Board of Education,* 281 U. S. 370 * * *."

(3) the four donee colleges here involved all furnish a secular liberal arts education comparable to that furnished by other first rank liberal arts colleges in the United States and are accredited by standard accrediting agencies. The courses taught in the four donee colleges are taught in substantially the same manner as at other similar colleges, for example, Johns Hopkins or Goucher, and are not used as vehicles for religious indoctrination; the text books are chosen by the individual teachers for their merit in supplying knowledge of the course and are not chosen for their religious orientation or because of the religion of the author and, in most instances, are the same texts that are used at other public and private colleges. No doctrine, dogma or other teaching of any church enters into or inter-

feres with the teaching of the secular subjects that are taught. Graduates of the four donee colleges go on to take graduate studies and obtain degrees on an equal basis with graduates of other public and private colleges at universities offering the best post graduate courses, such as Johns Hopkins and Columbia. There are no religious requirements, oral or written, for admission of students to the donee colleges and, finally, the buildings to be erected with the funds granted will be places which will further the secular training offered by the colleges and not used for religious ceremonies or instruction.

(4) the factors of (a) a rapidly expanding population of the State and the Country, (b) an increasing proportion of that part of the population of college age which attends college, and (c) an ever more complex society which requires ever more highly developed skills of more people in order to supply individuals competent to conduct the affairs of government and the private economy and furnish professional and scientific services, have strained college facilities, physical and human, to the limit, if not beyond, and will combine to require more and more such facilities. Private colleges furnish a most significant help in offering the collegiate and graduate training now available. It is said that there are some 2000 private institutions of higher learning in the Country, of which 800 are church-related. See 109 Cong. Rec. 18406 (daily ed. Oct. 11, 1963). If they are to continue to do their part and bear the new load of increased enrollments, they must have new facilities and, since private colleges traditionally have financial problems which limit their expansion, much of the cost of new facilities must come from government, if it is to come at all. The State of Maryland, as has been noted, has recognized this since early times and the federal government likewise has been aiding institutions of higher learning since the passage of the Morrill Land Grant Act of 1862. Federal funds which go to colleges and universities, a number of them sectarian, for research contracts, loans and outright grants currently exceed two billion dollars a year.

It is in this setting and with this background that the constitutionality of the grants made by the Maryland Legislature to Hood, Western Maryland, Notre Dame and St. Joseph Colleges should be considered and determined. The decisive issue

cannot be said to be simple, but it is narrow—does State financial assistance to the secular educational facilities of a college which is sponsored or controlled by a church or a religious order and in which there is a religious atmosphere amount to the establishment of religion within the meaning of the words of the first amendment as those words have been construed recently by the Supreme Court. The case of *Everson v. Board of Education,* 330 U. S. 1, 91 L. Ed. 711, which occasioned the dicta by Justice Black as to what the State cannot do lest it breach the "wall of separation" between church and state, which he repeated in *McCollum v. Board of Education,* 333 U. S. 203, 92 L. Ed 649, and *Torcaso v. Watkins,* 367 U. S. 488, 6 L. Ed. 2d 982, and Chief Justice Warren quoted in *McGowan v. Maryland,* 366 U. S. 420, 6 L. Ed. 2d 393, which both the appellants and the majority of the Court heavily stress and rely on, *held* that the furnishing of money by the state to reimburse parents for the cost of transporting their children to parochial schools did not violate the provisions of the first amendment that no law shall be made "respecting an establishment of religion." *McCollum* is not in point since it dealt with the action of a public school administration in relation to public sponsorship of religious exercise or instruction in the public schools.

*Torcaso,* as I read it, held that the Maryland prerequisite of an oath of belief in God to becoming a notary public was invalid because it employed an essentially religious, although nonsectarian, means to achieve a proper secular goal—worthy notaries public—to which the means had no reasonable relation. *McGowan* held that Sunday Closing Laws as presently written and administered "bear no relationship to establishment of religion as those words are used in the Constitution of the United States," since they serve a proper secular purpose and the aid they give to religion is incidental.

Following the decision of the Supreme Court in *Engel v. Vitale,* 370 U. S. 421, 8 L. Ed. 2d 601, which held that the organized recital in New York public schools of the so-called Regent's prayer violated the establishment of religion clause, public frustration and resentment with the Court's views and interpretation of that clause increased and there was widespread criticism of decisions on the point, ranging from the reasoned

and tempered suggestions of Professor Sutherland in *Establishment According to Engel* in 76 Harv. L. Rev. 25 that the reasoning and result of *Engel* were unsound to ill-advised and intemperate comments, often based on a misunderstanding of the basis and effect of the decisions. In deciding *Abington School Dist. v. Schempp*, 374 U. S. 203, 10 L. Ed. 2d 844, which held that the reading, without comment, at the opening of each school day, of verses from the Bible and recitation in unison of the Lord's prayer, violated the establishment clause, the Court, in the traditional way of courts, did not acknowledge error and adhered to its views but was particularly careful in its opinion to in effect answer criticism by specifying just what had been held before and was being held then, and to say, with words chosen even more carefully than usual, just what the law was. For this reason I ascribe great weight to *Schempp* as a guide to what will and what will not offend the establishment rule the Court has drawn.

Justice Clark, for the Court, pointed out that religion consistently has been identified with our history and government and that religious freedom is imbedded in our public and private life. He then reviewed the prior cases and their holdings and dicta, and said:

"As we have indicated, the Establishment Clause has been directly considered by this Court eight times in the past score of years and, with only one Justice dissenting on the point, it has consistently held that the clause withdrew all legislative power respecting religious belief or the expression thereof. The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be *a secular legislative purpose and a primary effect that neither advances nor inhibits religion. Everson v. Board of Education, supra; McGowan v. Maryland, supra,* at 442." (Emphasis supplied.)

*Murray, Etc. v. Comptroller,* 241 Md. 383, 398, upheld the validity of tax exemptions (equated to direct grants which indubitably benefited the recipient religious group) to religious organizations and in its opinion by Judge Oppenheimer synopsized the Supreme Court decisions as holding that:

> "If the primary purpose of the state action is to promote religion, that action is in violation of the Amendment, but if a statute furthers both secular and religious ends, an examination of the means used is necessary to determine whether the state could reasonably have attained the secular end by means which do not further the promotion of religion."

I think that the four grants under consideration were made pursuant to long-established practice to further a secular public purpose and that any aid or benefit flowing from them to religion would be slight, vague and purely incidental. The grants will supply added facilities which will help the secular educational activities of religious groups and will aid students who now and hereafter attend the institutions and the people of the State of Maryland by increasing the number of those who can receive a college education and the quality of the education that the increased number will receive. The grants will not aid religion or a religious group; those who attend college are or are not at that age religiously inclined and if they are, have, in almost all cases, become attached to a particular faith. Students are not proselytized at any of the four donee colleges. It will not aid religion or the Catholic Church for more students, mostly Catholic, to be able to attend St. Joseph or Notre Dame, or the Methodist Church for more students, largely Methodists, to attend Western Maryland College (and in both cases to receive perhaps a better education because of the grants) to a degree greater than it will society in general. The benefit to religion or a religious sect is as small and as incidental as was the benefit to religion and most church groups in *McGowan* and to the parochial schools in *Everson*—more students were enabled to attend parochial schools by reason of the grants approved in *Everson*. If it be delicately suggested that perhaps *Everson* might not be decided in 1966 or thereafter as it was in 1947,

there are at least two answers. One, the suggestion makes it only one of a relatively large number of cases and judges of a rank below the Supreme Court should not indulge in judicial speculation as to what that Court will do. Two, *Everson* has not yet been overruled and the Supreme Court in 365 U. S. 299, 5 L. Ed. 2d 688, dismissed the appeal in *Snyder v. Town of Newton* (Conn.), 161 A. 2d 770 (which upheld a Connecticut law authorizing transportation by a town of children to a parochial school) "for want of a substantial federal question," and *Everson* was cited with approval in *Schempp*.

There is no reasonable alternative to State aid to private institutions of higher learning. Theoretically, the State might enlarge State colleges enough to care for all actual and potential students or create new public colleges to do so. Tremendous sums would be required in either case and, what is more important, available physical facilities and faculty and administrative staffs could not be produced for years. In the Note, *Constitutionality of Federal Financial Aid to Church-Related Colleges*, 77 Harv. L. Rev. 1353, 1358, the author points out that of the 2,000 institutions of higher learning in the United States 800 are church-related, and says:

> "To exclude these 800 institutions of higher learning from federal aid would seriously hamper the effort to increase enrollment capacity to the point where colleges will be able to handle the expected demand of 1970 and distort the present educational allocation of students between denominational and nondenominational schools. * * * Such pragmatic considerations would be irrelevant if the command of the Constitution were clear; the remedy would then be a constitutional amendment. However, the lack of an effective alternative should be highly relevant when a plausible constitutional defense can be made and where, in an area of church-state overlap, criteria can be formulated which minimize governmental intrusion into religious concerns without paralyzing governmental attempts to cope with urgent national problems."

On the question of constitutionality, the author, at pp. 1356-57, says:

> "On the other hand, the opinions of Justices Clark and Brennan in *Schempp* indicate that federal aid to education would be considered constitutional. For example, Justice Clark enunciated the test of constitutionality to be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. Similarly Justice Brennan would draw the line at legislation employing the organs of government for essentially religious purposes or using essentially religious means to serve governmental ends where secular means would suffice. Under either test, the act would appear to be free from constitutional flaws"

and indicates his view that state aid to church-related colleges is constitutional.

As did Judge Duckett below, I think the grants should be declared valid. Early federal and state cases which, in addition to authorities already cited, support this view include, in Maryland: *Baltzell v. Church Home,* 110 Md. 244 (the home was affiliated with and supported and controlled by the Episcopal Church, and the Court found a gift to it needed no legislative sanction as required for a gift to any "religious sect, order or denomination") ; *Mt. St. Mary's v. Williams,* 132 Md. 184 (holding the Catholic college not to be a religious sect, order or denomination). See also *St. John's College v. State,* 15 Md. 330 (St. John's was then closely related to St. Anne's Church in Annapolis) ; *St. Mary's Indust. School v. Brown,* 45 Md. 310; *Finan v. M. & C. C. of Cumberland,* 154 Md. 563 (part of proceeds of a bond issue went to Sisters of Charity of the Catholic Church for their hospital) ; and *Board of Education v. Wheat,* 174 Md. 314, referred to earlier.

Federal cases include *Colbert v. Speer,* 24 App. D. C. 187, aff'd *Speer v. Colbert,* 200 U. S. 130, 50 L. Ed. 403 (Georgetown College, run by an Order (Society of Jesus) of the Catholic Church, was held not to be a sectarian institution or a religious sect, order or denomination) ; *Bradfield v. Roberts,* 175 U. S. 291, 44 L. Ed. 168 (Commissioners of the District of Co-

lumbia paid a Catholic hospital—run by the order which runs St. Joseph College—out of funds appropriated by Congress—so much per poor patient. It was held that neither the appropriation nor the payments violated the first amendment) ; and *Cochran v. Board of Education,* 281 U. S. 370, 74 L. Ed. 913 (it was held constitutional for the State to furnish free textbooks to all students, including those used by students in parochial schools).

Judge Horney and Judge Marbury concur in the view herein expressed and, as would I, would affirm.